**PORTO RICO RY., LIGHT & POWER CO. v. COLOM, Com'r of Interior of Puerto Rico, et al.**

No. 3404.

Circuit Court of Appeals, First Circuit.

Aug. 2, 1939.

Writ of Certiorari Denied Dec. 4, 1939.

See 60 S.Ct. 263, 84 L.Ed. ——.

---

[4] Wabash R. Co. v. Adelbert College, 208 U.S. 38, 28 S.Ct. 182, 52 L.Ed. 379;

Willcox v. Harriman Securities Corp., D.C., 10 F.Supp. 532.

Carroll G. Walter, of New York City, and Henri Brown, of San Juan, P. R., for appellant.

William Cattron Rigby and Robert E. Sher, both of Washington, D. C., and A. Cecil Snyder, of San Juan, P. R. (Nathan R. Margold, of Washington, D. C., and B. Fernandez Garcia, of San Juan, P. R., on the brief), for appellees.

Before WILSON, Circuit Judge, and PETERS and MAHONEY, District Judges.

MAHONEY, District Judge.

This is an appeal from a decree of the District Court of the United States for Puerto Rico dismissing a bill of complaint brought by the Porto Rico Railway, Light and Power Company against certain officials of the Insular Government of Puerto Rico, and certain officials of the federal government. The purpose in bringing the bill of complaint was to enjoin the insular government from the construction of certain proposed or contemplated plants and lines for the distribution of electric power in the franchise territory of the appellant, and to enjoin the use of federal funds in such construction.

The appellant is a Puerto Rican corporation, was organized on March 15, 1911, and under its articles of incorporation is authorized to conduct business as a public utility. The corporation is also empowered by its articles to take assignments of and operate under franchises held by certain other companies. After incorporation, the appellant acquired the properties of the Porto Rico Power and Light Company, and the San Juan Light and Transit Company. Included in the property acquired from said two companies was a franchise granted to the Porto Rico Power and Light Company by the Executive Council of Puerto Rico in 1906; a franchise granted to the Porto Rico Power and Light Company by the Executive Council of Puerto Rico in 1909; and a franchise granted to the San Juan Light and Transit Company in 1909. In addition to the three franchises acquired by assignment, the appellant has two other franchises, namely one granted to it by the Executive Council of Puerto Rico in 1911, and one granted to it by the Public Service Commission of Puerto Rico in 1927.

In the record in this case, the franchise granted to the Porto Rico Power and Light Company in 1906 is designated as the 1906 franchise; the franchise granted to the Porto Rico Power and Light Company in 1909 is designated as the 1909 franchise; the franchise granted to the San Juan Light and Transit Company in 1909 is designated as the San Juan franchise; the franchise granted to the appellant in 1911 is designated as the 1911 franchise; and the franchise granted to the appellant in 1927 is designated as the Rio Blanco franchise. Under the 1906 franchise the grantee, and its successors and assigns, were granted the right to build a dam across La Plata River at Comerio Falls and to do all things necessary and proper for developing the water power of La Plata River, and generating and distributing electric energy for profit in the City of San Juan and in certain other municipalities, including Manati and Santa Isabel and "all municipalities to the east thereof". Under the 1906 franchise there was reserved to Puerto Rico the right to take 260 cubic feet of water per minute from La Plata River and the grantee agreed to furnish current at reduced rates, and also undertook to keep in reserve a steam plant, with capacity sufficient at all times to properly light the streets of the municipality of San Juan.

The 1909 franchise amends the 1906 franchise by authorizing the building of additional dams and power stations on La Plata River, by excluding from the franchise territory certain areas granted by the 1906 franchise, and by adding a section containing a provision similar to one contained in the "Carite Agreement", so called, and which will be dealt with more fully later herein.

The San Juan franchise gives the right to maintain and operate an electric power plant for the furnishing of electric power, light and heat to the public for profit, and to extend poles, wires, and transmission lines for that purpose.

The 1911 franchise approves the acquisition by assignment of the 1906, 1909 and San Juan franchises, and reenacts and regrants the same to the appellant. Under the terms of the 1911 franchise the appellant agreed to furnish free of charge electric current to the executive mansion of Puerto Rico.

Under the Rio Blanco franchise, the appellant acquired the right to construct a plant at Rio Blanco Falls on the Rio Blanco River, and to generate and distribute electricity. This franchise also required the appellant to connect the new plant with the plants operated under the earlier franchises so that they would be interconnected. At this time the appellant released to Puerto Rico an additional amount of water from La Plata River, agreed to reduce its rates, and to relieve Puerto Rico of the obligation to deliver to appellant certain power by the Carite Agreement. The appellant also agreed to pay to Puerto Rico a royalty on power generated at the plant authorized under the Rio Blanco franchise.

Under the 1906 franchise the appellant's predecessor built a dam across La Plata River at Comerio Falls, a canal, a pipe line and power station. Under the 1909 franchise, the appellant built another dam and canal, pipe line and power station. These plants are now known as Comerio No. 1 and Comerio No. 2. These two plants are also interconnected and a transmission line runs from them to San Juan. A steam plant, as required by the 1906 franchise, has been and is maintained, with sufficient capacity to light the streets of San Juan, and the steam plant is electrically interconnected with the Comerio plants. In accordance with the Rio Blanco franchise, the appellant has constructed below a site known as Rio Blanco Falls, dams, pipe-lines, pen-stock and power house, and a transmission line to San Juan. The Rio Blanco plant is electrically interconnected with other plants operated by the appellant, with the result that all the plants of the appellant constitute one system. The appellant also has 136 miles of transmission lines and 500 miles of distribution lines which extend into thirty-five different municipalities, and service is rendered to the municipalities and the inhabitants thereof. Included in the places served are San Juan, Rio Piedras and Guaynabo, and in these places the appellant serves both the municipalities themselves, and the inhabitants thereof. In these places the appellant supplies lighting for streets, and for public buildings, and power for the water works. Appellant also serves numerous buildings and dependencies of the insular government located in San Juan, Rio Piedras and Guaynabo. Large sums of money have been invested by the appellant and its predecessor in the San Juan steam plant, and in equipment for the supplying to the water works, street lights and electric service to the insular and municipal dependencies in San Juan, Rio Piedras and Guaynabo.

About two years after the granting of the 1906 franchise, it became evident that the insular government intended to engage in irrigation projects, and in the production and distribution of electric power. By legislation approved September 18, 1908, provision was made for the construction by the insular government of an irrigation system for the territory situated approximately between the River Patillas on the east and the River Portugues on the west. To effect this end, the insular government proposed to divert some of the waters of La Plata River through a tunnel in the mountains into a water shed on the south side of the island. Controversy arose as to the right of the insular government to divert water as proposed, in view of the existence of the 1906 franchise held by the appellant's predecessor, and the right to make such diversion was challenged by the appellant's predecessor. For the purpose of adjusting this difference, an agreement was entered into on May 28, 1909, between the appellant's predecessor and the People of Puerto Rico, said agreement being dated nine days after the granting of the 1909 franchise. This agreement, which has become known as the "Carite Agreement", recites that the People of Puerto Rico proposes to create electrical energy by the use of water to be taken from the headwaters of the La Plata River, and to supply light, heat and power to places within a reasonable distance from the point known as "Carite", and whereas differences have arisen between the parties concerning the right of the People of Puerto Rico to use the waters of said La Plata River for the purposes contemplated, and that it is to the advantage of all that the differences be settled without litigation, the agreement is entered into. Under the terms of the agreement it is provided that the People of Puerto Rico are permitted to take all the waters of the tributary of La Plata River flowing through the ward of Carite at and above the site of a proposed dam, and to divert the same through a tunnel in the mountain divide; that Porto Rico Power and Light Company renounces its rights under the 1906 franchise to supply light, heat and power to the inhabitants of certain towns and territory therein set out; that the People of Puerto Rico will exercise its right to utilize the

260 cubic feet of water per minute from the Carite branch of La Plata River above the dam to be constructed; that to compensate the Porto Rico Power and Light Company for loss resulting from taking more than 260 cubic feet of water per minute, the People of Puerto Rico agreed to deliver to Porto Rico Power and Light Company a specified amount of electrical energy and the right of the Porto Rico Power and Light Company to such power was to be preferential over other consumers of electrical energy furnished by the People of Puerto Rico; that the People of Puerto Rico would obtain the necessary easement for a right of way for a transmission line for the delivery of the power agreed to be delivered to Porto Rico Power and Light Company, and would also pay $10,000 toward the construction of such a transmission line for the delivery of such power. The agreement then contains the following paragraph:

"Seventh: The People of Porto Rico will not, with the electrical power to be created at the Carite power plant, neither itself, nor through, nor by the agency of any other person, corporation, grantee or municipality, compete, within the territory of the 'Porto Rico Power and Light Company', as defined herein, nor with the said Caguas Electric Company; provided, always, that if when said Carite power house shall be completed and the People of Porto Rico is ready to supply light, heat and power to the inhabitants of any of the cities, towns or territory not hereby reserved to the People of Porto Rico, the said people of Porto Rico may notify the Porto Rico Power and Light Company of its intention to supply said cities, towns, or territory, and unless the Porto Rico Power and Light Company or the Caguas Electric Company, shall within three months thereafter place itself in a position to supply said cities, towns or territory, the People of Porto Rico shall have the right to do so."

After entering into the Carite Agreement, Puerto Rico constructed two diversion tunnels within the franchise territory granted by the 1906 franchise and excluded by the 1909 franchise; and in 1915 completed a power plant at the southerly end of one of said diversion tunnels, this plant being now designated as Carite Plant No. 1. This plant was enlarged by building another plant in 1922, which is designated as Carite Plant No. 2. Each of these plants utilizes and depends upon the water power created by means of one of the diversion tunnels. Since the establishment of the Carite project the government of Puerto Rico has supplied water for irrigation, as well as hydro-electric power, to customers in the southern and central part of the island outside the territory served by the appellant. The area served by the insular government by the Carite plants is practically identical with the franchise territory granted by the 1906 franchise and excluded by the 1909 franchise.

In furtherance of the insular government's power policy, the Puerto Rico Legislature in April, 1927, passed, and the Governor approved a resolution which established an agency designated as "Utilization of the Water Resources", and now popularly called "U. W. R.". The resolution declares that the adoption and execution of a plant for the development and operation by the People of Puerto Rico of such water resources as are susceptible of economic development is a matter of public necessity and convenience. It imposes a tax to provide funds for such development and makes provision for the disposition of such income as may be derived from the sale of electric power to be produced by plants to be constructed under its provisions. The resolution also provides that after the approval of projects, in the manner set out in the resolution, the Commissioner of the Interior is authorized and directed to attend to all matters connected with the construction of the works and shall appoint the personnel including the Engineer-Director of the Insular Hydroelectric Service. Under the direction of the Engineer-Director of the Insular Hydroelectric Service, a hydroelectric plant now known as Toro Negro Plant No. 1 was constructed in 1928 and 1929. This plant is also located within the franchise territory granted by the 1906 franchise and excluded by the 1909 franchise. This plant was interconnected with the Carite plant. The insular government also acquired by purchase the privately owned electric system at Ponce, this purchase having been made by the Utilization of Water Resources in April, 1937.

After entering into the Carite agreement in 1909, and up to 1934, it appears that no effort was made or intention evidenced on the part of the insular government, to enter the franchise territory of the appellant until about 1934. In that year (1934) official reports of certain insular officers indicate that thought was

being given to extend the government's hydroelectric system into territory served by the appellant. This intention became apparent in 1935, for in March of that year the Legislature of Puerto Rico adopted, and the Governor approved, a joint resolution which gave plain notice of such an intent. Said joint resolution declares, · among other things, that the insular government would be greatly benefited by the extension of the service and the furnishing of electric power from the plants which form the system of Utilization of Water Resources, and by utilizing this service only for public purposes of said government, as well as for its buildings within the territorial limits of the capital and of neighboring towns; that The Government of the Capital is at present obliged to spend large sums of money for lighting its streets, plazas, and· avenues, and for the use of electric energy for the operation of its water works; and ·that the extension of transmission lines and the construction of lighting lines and systems for the use of such buildings of the insular government as are within the capital or in neighboring towns, and for their utilization by the Government of the Capital are considered advisable and highly beneficial to public interests. The resolution then provides in substance: that the Commissioner of the Interior of Puerto Rico and the Engineer-Director of the Insular Hydroelectric Service in charge of the Utilization of Water Resources of Puerto Rico are authorized and directed to make connections from the transmission lines provided for, extending from the plants which form the system for the utilization of the ·water resources, to the different buildings and dependencies of the insular government mentioned in the whereases of the resolution, and to all dependencies of the insular government within the limits of the Capital, Rio Piedras, and Guaynabo, as, in the opinion of the Commissioner of the Interior, must be furnished with said services; that the Commissioner of the Interior of Puerto Rico and the Engineer-Director of the Insular Hydroelectric Service in charge of the Utilization of Water Resources are authorized and directed to construct immediately within the territorial limits of the Government of the Capital transmission lines with the object of supplying electric current to the Government of the Capital for the lighting of streets, avenues, plazas, and its public buildings; that the Commissioner of the Interior and

the Engineer-Director in charge of the Utilization of Water Resources are authorized and directed to construct and extend the transmission and distribution lines provided for in the resolution, as well as the apparatus; and provision for payment for such extensions is made.

Practically coincident with these activities on the part of the insular government, the attention of the federal government was being directed toward the island with respect to its power policy. On May 28, 1935, there was established within the federal Department of the Interior an agency designated as "Puerto Rico Reconstruction Administration", this agency being charged with the duty of administering the expenditure in Puerto Rico of federal funds allocated under the Emergency Relief Appropriation Act of April 8, 1935. In September of the same year, allocations were made out of federal funds for certain hydro-electric projects in Puerto Rico, including funds for the construction of an additional hydro-electric plant at Carite, an additional hydro-electric plant at Toro Negro, the extension of the existing hydro-electric plant at Toro Negro, and the construction of new hydro-electric projects at Garzas and Dos Bocas. The allocations also provided for construction of transmission and distribution lines to dispose of the energy produced at the new plants. It appears that at the present time the new construction at Carite and Toro Negro has been completed and turned over to the insular government; and that the plants at Garzas and Dos Bocas are approximately half completed. The new construction at Carite and Toro Negro has been tied into the insular system. It is planned to tie into the insular system, the plants at Garzas and Dos Bocas when they are completed. At the present time there are in existence and operation under the insular government, Carite Plants Nos. 1, 2 and 3, and Toro Negro Plants 1 and 2, and No. 1 Extension, and the Ponce plant, which was purchased from the previous owner, and all are interconnected.

Following the adoption of the joint resolution in March, 1935, above referred to, survey was made to determine upon a route for the transmission line into San Juan, for the purpose of complying with the terms of said joint resolution. It was determined to run the line from the Toro Negro Plant No. 1 northeasterly past Barranquitas, through Aguas Buenas, past the Insular Sanatorium at Rio Piedras and

thence into San Juan. One part of this proposed line, namely that part from Toro Negro to Pala Hincado (a part of Barranquitas) has been completed and the substantial part of its costs was paid for out of allocated federal funds. Work on other parts of the route has been partly done. To prevent the completion of this proposed transmission line into San Juan and the production of electric energy for the purposes contemplated in the Joint Resolution of March, 1935, these proceedings were brought.

The court below dismissed the bill, after a trial, and this appeal is from its decree of dismissal. It made certain findings of fact and certain conclusions of law.

The appellant maintains that the acts complained of should be enjoined because they constitute a violation and invasion of appellant's rights under its franchises, and under a contract between it and Puerto Rico, and that insofar as orders and enactments authorize these acts, they are in conflict with the Constitution of the United States, U.S.C.A.Const. art. 1, § 10, and of the Organic Act of Puerto Rico, 48 U.S.C.A. § 737, in that they impair the obligation of appellant's franchises and contract, deprive it of its property without due process of law, and take its property without just compensation. In support of this general proposition, the appellant first argues that one of the obligations of its franchises is that it shall not be prevented from performing them, and that as the enactments under which the appellees attempt to justify their actions prevent such performance in substantial parts, they impair the obligations of the appellant's franchises and take the appellant's property without due process of law and without just compensation.

 It is now well settled that franchises, which by their terms are not exclusive or do not grant a monopoly in the franchise territory, do not entitle the holders of such franchises to be free from competition.

"The franchise to exist as a corporation, and to function as a public utility, in the absence of a specific charter contract on the subject, creates no right to be free of competition, and affords the corporation no legal cause of complaint by reason of the state's subsequently authorizing another to enter and operate in the same field. The local franchises, while having elements of property, confer no contractual or property right to be free of competition either from individuals, other public utility corpo-rations or the state or municipality granting the franchise." Tennessee Electric Power Company v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 370, 83 L.Ed. 543.

And in Turnpike Company v. State, 3 Wall. 210, 213, 18 L.Ed. 180, the following very clear statement is found:

"The difficulty [of the argument in behalf of the turnpike company], however, which lies at the foundation of this defense is, that there is no contract in the charter of the turnpike company that prohibited the legislature from authorizing the construction of this rival railroad. No exclusive privileges had been conferred upon it, either in express terms or by necessary implication; and hence, whatever may have been the general injurious effects and consequences to the company, from the construction and operation of the rival road, they are simply misfortunes which may excite our sympathies, but are not the subject of legal redress."

And in Knoxville Water Co. v. Knoxville, 200 U.S. 22, 26 S.Ct. 224, 50 L.Ed. 353, the court held that even where a city had granted a franchise to a water company and had agreed not to grant a similar privilege to any other person or corporation, the city was not within the prohibitive clause, and was not prohibited itself from constructing a competing water works system. The doctrine of this case was affirmed by Mr. Justice Holmes in Madera Water Works v. Madera, 228 U.S. 454, 33 S.Ct. 571, 572, 57 L.Ed. 915, where he said:

"So strictly are private persons confined to the letter of their express grant that a contract by a city not to grant to any person or corporation the same privileges that it had given to the plaintiff was held not to preclude the city itself from building waterworks of its own."

None of the franchises held by the appellant are exclusive by their terms, except insofar as the clause of the 1909 franchise and the Carite agreement may restrict the insular government. In fact, this court has found in the case of Gallardo v. Porto Rico Ry., Light & Power Co., 1927, 1 Cir., 18 F.2d 918, 921, as follows:

"None of the plaintiff's franchises are, in terms, exclusive; all are 'subject to amendment, alteration or repeal' under the Act of April 12, 1900 (31 Stat. 77). Cf. Sec. 37 of the Organic Act (39 Stat. 951 [48 U.S.C.A. § 821]."

██ The position of the appellant is therefore practically tantamount to saying that a government which grants it a franchise and which at the time of the granting of such franchise requires that provision must be made for the furnishing to the government of certain services, impliedly contracts that it will remain a customer of the company throughout the lifetime of the franchise. Appellant contends that the requirement made at the time of the granting of the 1906 franchise, of keeping in reserve a steam plant with capacity sufficient at all times to properly light the streets of the municipality of San Juan, implies the correlative right to light the streets of San Juan. Such a conclusion is not logically justified. In the first place, lighting public buildings and public places by electricity is at most a matter of public policy. It is perfectly conceivable that for reasons of public policy the government might determine to discontinue lighting by electricity. Science might produce some method of lighting more advantageous, or economic factors might require a curtailment of lighting, or safety requirements in certain times of stress might require elimination of lighting of public buildings and places. Appellant's position amounts to saying that the government must continue to buy from it. Conditions might make it feasible to discontinue lighting by electricity as a public policy. If the contention of the appellant is correct, that it has a property right to light the streets of San Juan, then such a property right would continue to exist despite the fact that public necessity required that such lighting be discontinued. If such a right was to be created by any of the franchises held by the appellant, it should have been clearly stated, and not left to inference. In fact, it is firmly established that rights of this character cannot be left to inference. In Coosaw Mining Co. v. South Carolina, 144 U.S. 550, 562, 12 S. Ct. 689, 691, 36 L.Ed. 537, the following language is found:

"The doctrine is firmly established that only that which is granted in clear and explicit terms passes by a grant of property, franchises, or privileges in which the government or the public has an interest." Cases cited. "Statutory grants of that character are to be construed strictly in favor of the public, and whatever is not unequivocally granted is withheld. Nothing passes by mere implication." Cases cited. "This principle, it has been said, 'is a wise one, as it serves to defeat any purpose concealed by the skillful use of terms to accomplish something not apparent on the face of the act, and thus sanctions only open dealing with legislative bodies.'"

And this view is again stated in Knoxville Water Co. v. Knoxville, 200 U.S. 22, 37, 26 S.Ct. 224, 229, 50 L.Ed. 353, in the following words:

"It is, we think, important that the courts should adhere firmly to the salutary doctrine underlying the whole law of municipal corporations and the doctrines of the adjudged cases, that grants of special privileges affecting the general interests are to be liberally construed in favor of the public, and that no public body, charged with public duties, be held, upon mere implication or presumption, to have devested itself of its powers."

Also in Helena Water Works Co. v. Helena, 195 U.S. 383, 392, 25 S.Ct. 40, 43, 49 L.Ed. 245, this doctrine is again set out in the following words:

"It is doubtless true that the erection of such a plant by the city will render the property of the water company less valuable, and perhaps, unprofitable; but if it was intended to prevent such competition, a right to do so should not have been left to argument or implication, but made certain by the terms of the contract."

Also in St. Clair County Turnpike Co. v. Illinois, 96 U.S. 63, 68, 24 L.Ed. 651, this doctrine is again set out as follows:

"Grants of franchises and special privileges are always to be construed most strongly against the donee, and in favor of the public."

██ If it was the expectation of the holder of the franchises involved in this case that there be a continual right to furnish services in San Juan, this should have been insisted upon at the time of receiving the franchises and should not have been left to implication. The franchises do not grant any right which precludes the insular government from withdrawing its own patronage from the appellant and serving itself. In fact, it seems that the appellant virtually admits the right of the insular government to furnish itself with power, as it states in the footnote of its brief on page 41 as follows:

"If the Court meant that to sustain our proposition would deny to Puerto Rico the right to set up a dynamo in the basement of its buildings and generate and deliver

electric power therein, of course that is not so. Puerto Rico can do that as freely as it can light candles in its buildings."

If the insular government has the right to light each of its buildings by power produced in the cellar of each building, or has the right to light its buildings by candles, and in using either of these methods of lighting it violates no rights of the appellant, it is difficult to see in what way it can be urged that the introduction of electricity into insular buildings from a power plant operated by the government does constitute a violation of appellant's rights. The method may be different, but the same rule of law is applicable. Appellant, however, seeks to draw a distinction in this case by alleging that by attempting to furnish municipal power for operation of water works, and the lighting of streets, avenues and plazas, the insular government deprives the appellant of its right to furnish these services. Appellant stresses particularly its alleged rights in relation to San Juan, and says that it is a separate legal entity, a separate body politic, a juristic person, with powers of local self government, including particularly the right to light its own streets and operate its own water works from the source and in the manner in which its local governing board prescribes. It is true, no doubt, that all municipal corporations are legal entities, separate and distinct from the government creating them, but on the other hand they are subdivisions of the general government from which they derive their existence, and by which they are entrusted with certain governmental functions of a local nature. They are in a certain sense agents of the general government, created for the purpose of performing delegated functions. An examination of the pertinent parts of the Organic Act reveals that municipalities in Puerto Rico are not unlike municipal corporations under the states, and that the Legislature of Puerto Rico has the power to create, consolidate, and reorganize the municipalities so far as may be necessary, and to provide and repeal laws and ordinances therefor. Under these provisions, it seems clear that municipalities are in reality nothing more than subdivisions of the insular government. That San Juan, for instance, is not such a distinct entity in the sense now contended for by the appellant is evident when it is realized that the rights which the appellant contends it has in San Juan, it maintains, came through action of the insular government. In the exercise of governmental functions, the municipalities are in reality acting as a branch of the insular government, and the furnishing to the municipalities of the services contemplated by the March 1935 Joint Resolution is, in fact, furnishing electricity to itself, or a part of itself.

The appellant further insists that the introduction of electric power into appellant's territory, as proposed and threatened, would constitute a breach of the noncompeting agreement embodied in the 1909 franchise and in the Carite agreement. Furnishing services to oneself does not constitute competition, as that term is generally accepted, and furnishing power as contemplated for the insular government and the municipal purposes, is in effect a case of the insular government supplying itself. But if the case were to be judged on the basis of this agreement alone, it does not appear that the acts proposed or contemplated are in violation of the noncompeting clause of the 1909 franchise, or the terms of the Carite agreement. Both the clause relied on in the 1909 franchise, and the terms of the Carite agreement, are practically identical. Clause 16 of the 1909 franchise contains the following:

"Section 16. The government shall not either itself or through any person, corporation, grantee, or municipality, compete with the electric power to be created at the Carite power plant, with either the grantee of this franchise or the Caguas Electric Company. * * *"

And the Carite agreement contains the following: "Seventh: The People of Porto Rico will not, with the electrical power to be created at the Carite power plant, neither itself, nor through, nor by the agency of any other person, corporation, grantee or municipality, compete within the territory of the Porto Rico Power and Light Company as defined herein. * * *"

The said noncompeting clause of the 1909 franchise and the terms of the Carite agreement are to be construed with the same liberality in favor of the government, as is cited in the cases supra. A plain reading of these clauses leaves no doubt that the only competition prohibited is competition with the electrical power to be created at the Carite power plant. If competition by electrical power to be produced at any other plant was contemplated, it should have been so stipulated and not

left to implication. In this case, it is a matter of fact that the proposed line into San Juan is to be run from the Toro Negro plant, and not from the Carite plant. While the plants are interconnected, it is clear that the flow of any power from the Carite plant into the line running into San Juan can be prevented by the adjustment of the power factor by the operation of a synchronous condenser at some point between the two plants.

The Superintendent in charge of the Hydro-Electric System of Puerto Rico testified that the flow of power from the Carite plant into the Toro Negro line running from the Toro Negro plant to San Juan can be prevented at any time by the operation of a synchronous condenser installed between the Carite plant and the Toro Negro line, and the District Judge so found. Since it was not shown that at present there was such a flow of power from the Carite plant to the Toro Negro system and there transmitted to San Juan in commercial quantities in violation of the Carite agreement the plaintiff has shown no ground for injunctive relief. If, at any time, it is made to appear that there is such a flow of power into San Juan over the Toro Negro line from the Carite plant in commercial quantities to the injury of the plaintiff, it may be entitled to injunctive relief. It cannot be assumed that public officials will do wrong and transmit a flow of power from the Carite plant to San Juan.

Appellant also raises the point that the enactments of the Puerto Rico Legislature do not constitute authority for the contemplated acts, and that such authority can only come from the Public Service Commission of Puerto Rico. Under the rule of Tennessee Electric Company v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. ——, it does not seem that the appellant is now in a position to raise this question. Aside from the principle of law enumerated in that case, however, it does not seem that the position of the appellant on this point is sound. Present organic law of Puerto Rico provides that "all grants of franchises, rights, privileges, and concessions of a public or quasi-public nature shall be made by a public service commission". Similar provisions have existed for some time past. It is pertinent to note, however, that this provision relates to the "grants" of franchises. To grant means to confer upon some one other than the person or entity which makes the grant. For a government to exercise a function itself does not constitute a grant. The right of the insular government to engage in the power business has been recognized in the case of Gallardo v. Porto Rico Railway, Light & Power Company, 1 Cir., 18 F.2d 918. Furthermore, the history of the government's power activities indicates that at no time has the government sought consent of the Public Service Commission in connection with its operations. The Carite plants, the two Toro Negro plants and the government's entire system have been operated without consent of the Public Service Commission. The appellant has recognized the right of the insular government to engage inasmuch as the record discloses that certain commitments to deliver power and render other services have at times been accepted from the insular government. The requirement to receive a franchise from the Public Service Commission does not apply to the insular government.

Other points raised by the appellant refer to the alleged lack of authority under the federal legislation to advance funds to the insular government for the contemplated purposes, and if the federal legislation does authorize the advancement, the act, insofar as it does authorize such advancement, is unconstitutional. In view of the findings of the court on the other points raised by the appellant, this court is of the opinion that the appellant is not in a position to raise these other points. In view of the doctrines of law set out by the Supreme Court in the cases of Alabama Power Company v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374, and Tennessee Electric Power Company v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366, 83 L.Ed. 543, the appellant is not now in a position to question the legality of the acts of the federal officials, or to question the constitutionality of the legislation under which they act.

The Joint Resolution of March, 1935, which has been approved and ratified by an Act of the Legislature since the commencement of these proceedings, authorizes the carrying out of the contemplated action. Carrying out the proposed or contemplated acts do not violate any rights possessed by the appellant either under the Federal Constitution or the Organic Law of Puerto Rico.

Before the commencement of the trial in the District Court, counsel for

appellant suggested the applicability of Section 3 of the Act of Congress of August 24, 1937, 50 Stat. 752, 28 U.S.Code, § 380a, 28 U.S.C.A. § 380a, and asked for the convening of a three-judge court. The court below denied the motion and proceeded to hear the case. In this the District Court was not in error. In said Section 3 reference is made to any "district court of the United States". The term "district court of the United States" does not include the United States District Court of Puerto Rico. The said Court of Puerto Rico is a congressional court as distinguished from a constitutional court. See opinion of Chief Justice Taft in Balzac v. Porto Rico, 258 U.S. 298, at page 312, 42 S.Ct. 343, 66 L.Ed. 627.

 The findings of fact of the District Court are accepted by this court, as it does not appear that they are clearly wrong or do not rest on substantial evidence.

The decree of the District Court dismissing the bill of complaint is affirmed with costs of this court.