**T. H. WESSELLS, Appellant,**

**v.**

**STATE of Alaska, DEPARTMENT OF HIGHWAYS, Appellee.**

**No. 2834.**

Supreme Court of Alaska.

April 6, 1977.

**1044**

Robert L. Hartig and J. Michael Robbins, Cole, Hartig, Rhodes, Norman & Mahoney, Anchorage, for appellant.

Richard P. Kerns, Asst. Atty. Gen., Anchorage, Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

BOOCHEVER, Chief Justice.

This appeal from summary judgment involves the interpretation of a provision in a lease issued by the State of Alaska, Division of Lands. Paragraph 6 of the lease expressly reserves the right to grant an easement or right-of-way across the leased property. The central question before this court is whether that paragraph authorizes the state to utilize the entire parcel for highway purposes without compensating Wessells for his leasehold interest. Additionally, Wessells seeks review of the trial court's award of attorney's fees to the state.

The principal facts are undisputed. In August of 1972, Wesway Steel Company, of which Wessells is a majority shareholder, assigned its interest in certain leased property to Wessells. This assignment was approved by the State of Alaska. Thus, Wessells secured a forty-four-year leasehold interest with renewal rights. Wessells' leasehold comprised 12.785 acres of school trust lands and is located in Anchorage, Alaska, adjacent to the International Airport Road in the vicinity of the Minnesota bypass and the Alaska Railroad right-of-way. It was used for commercial and industrial purposes. This property was part of a larger parcel originally leased by the Division of Lands to Jet Terminals, Inc. in 1961 for a term of fifty-five years with a renewal preference.

Wessells now holds the land subject to the terms of the original lease to Jet Industries. Paragraph 6 of that lease is a form clause which appears to be inserted in many state leases and provides:

> The lessor expressly reserves the right to grant easements or rights-of-way across the land herein leased if it is determined to be in the best interests of the State to do so; provided, however, that the Lessee shall be entitled to compensation for all improvements or crops which are damaged or destroyed as a direct result of such easement or right-of-way.

Other provisions in the lease set forth the conditions of termination and cancellation. The lease also provides for adjustments in

rental value at five-year intervals to "be based primarily upon a reappraised annual rental value . . . ." Wessells' leasehold was last revalued in 1971 at which time his quarterly rental became $886.00.

In early January of 1973, the Division of Lands conveyed a right-of-way encompassing Wessells' entire leasehold to the Department of Highways. This conveyance was formally effectuated as an interagency land management transfer pursuant to an agreement of January 23, 1973. The Department of Highways paid the Division of Lands $585,700.00 for the right-of-way.

Wessells was notified of these transactions by letter and was informed that any compensation due him for improvements under Paragraph 6 would be paid by the Department of Highways. The Department tendered $35,000.00 as the fair market value of improvements, but Wessells refused the offer.

Mr. Wessells sought declaratory relief in the superior court to determine the parties' obligations under Paragraph 6 of the lease, claiming a right to compensation for the reduction in the value of the leasehold.[1]

The state admitted the facts but contended that pursuant to Paragraph 6, it had the right to devote the entire parcel to highway use without compensation beyond the value of improvements. Both parties moved for summary judgment.

After hearing oral argument, the trial court granted the state's motion. It found that Paragraph 6 was unambiguous and authorized the state to utilize the entire leasehold for highway or related purposes without compensating Wessells other than for improvements placed on the land. Mr. Wessells has appealed from the decision below.[2]

We have examined Paragraph 6 of this lease and must disagree with the trial court's finding. We find that the Paragraph 6 of the lease is ambiguous, and that Mr. Wessells may be entitled to partial compensation for his leasehold interest.

We begin with the premise that within the traditional framework of eminent domain, a lessee has a compensable interest in land.[3] It also is clear that "the right of the lessee to compensation, as any other right, may be waived or contracted away by the terms of the lease. . . ."[4] This brings us full circle back to the lease and the meaning of Paragraph 6.

The state argues that Paragraph 6 permits its use of the property without compensation. Wessells argues to the contrary. There are two portions of Paragraph 6 which are contested in this case. First, we must view the wording "The lessor expressly reserves the right to grant." Wessells claims this language permits

1. His amended complaint included a count for interference with a sublease contract and additionally prayed for over $7,000.00 in lost rentals from the sublease, in an amount to be specifically proven at trial.

2. In addition, Mr. Wessells contests the amount of $4,000.00 attorney's fees to the state. In view of our decision, we do not reach that issue.

3. *Alamo Land and Cattle Co., Inc. v. Arizona*, 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976); *United States v. Petty Motor Co.*, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729 (1946); *A. W. Duckett & Co. v. United States*, 266 U.S. 149, 45 S.Ct. 38, 69 L.Ed. 216 (1924). *See United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945); *Lassen v. Arizona ex rel. Arizona Highway Dept.*, 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1967); *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 93 S.Ct. 791, 35

L.Ed.2d 1 (1973); 2 Nichols' Law of Eminent Domain § 5.23 at 5–87 (rev'd 3rd ed. 1976).

4. *Phillips Petroleum Co. v. Bradley*, 205 Kan. 242, 468 P.2d 95, 98 (1970). *See Alamo Land and Cattle Co., Inc. v. Arizona, supra; United States v. Petty Motor Co., supra. See also People, Dept. of Public Works v. Amsden Corp.*, 33 Cal.App.3d 83, 109 Cal.Rptr. 1, 4 (1973). In *State v. Crosby*, 410 P.2d 724, 726 (Alaska 1966), this court stated that:

The fundamental issue here is whether the State may take appellee's land for highway purposes without payment of just compensation. It may if the reservation in the patent for a highway right-of-way is valid; it may not if the reservation is invalid.

*See also* 4 Nichols' Law of Eminent Domain § 12.42[1] at 12–488 and 12–489 (rev'd 3rd ed. 1976).

granting easements only to third parties. The state argues that under the above language, it is authorized to effectuate an interagency management transfer of an easement. Second, we must view the use of the word "easement" or "right-of-way."[5] Wessells contends that the use of the word "easement" does not permit a use which effectively destroys his entire twelve-acre estate. The state argues to the contrary.[6]

■■■ To ascertain the meaning of "reserve the right to grant" and the meaning of the word "easement," we shall follow the principles of contract interpretation set forth in *National Bank of Alaska v. J.B. L.&K. of Alaska, Inc.*, 546 P.2d 579, 584–86 (Alaska 1976). This involves a two-stage analysis.

In the first stage, we will look to both the language of the lease and extrinsic evidence to determine if the wording of the lease is ambiguous.[7] The mere fact that two parties disagree as to the interpretation of a contract term does not create an ambiguity. An ambiguity exists only where the disputed terms are reasonably subject to differing interpretation after viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms.[8]

If we determine that the language is ambiguous, we will proceed to the second stage of analysis and consider extrinsic evidence to attempt to resolve this ambiguity.[9] On the other hand, if the language is found to be unambiguous, it is construed according to the terms of the lease alone.[10]

**5.** A "right-of-way" is generally considered to be a class of easement. *Kurz v. Blume*, 407 Ill. 383, 95 N.E.2d 338, 339 (1950); Black's Law Dictionary, pp. 599, 1489 (4th ed. 1961).

**6.** Wessells also challenges the authority of the state to reserve the right to create easements. The authority of the state to reserve or grant easements, however, is beyond question. AS 38.05.035(a)(14) states:

When he [the Director of the Division of Lands] finds the interests of the state will be best served he may . . . approve contracts for the . . . lease . . . and in addition to the conditions and limitations imposed by law, he may impose additional conditions or limitations in the contracts as he, with the consent of the commissioner, determines will best serve the interests of the state.

Similar authority may be found in the language of AS 38.05.070, AS 38.05.085 and AS 38.05.120. There appears, therefore, clear authority for the state to reserve an easement. This statutory authority adequately encompasses the power to include conditions in a lease of state lands which subject the leased lands to a right-of-way or easement in the interests of the state. *See State v. Crosby*, 410 P.2d 724, 727 (Alaska 1966).

**7.** *National Bank of Alaska v. J.B.L.&K. of Alaska, Inc.*, 546 P.2d 579, 584–86 (Alaska 1976).

**8.** *Modern Construction, Inc. v. Barce, Inc.*, 556 P.2d 528 (Alaska 1976); *National Bank of Alaska v. J.B.L.&K. of Alaska, Inc.*, supra, at 584–86.

**9.** *National Bank of Alaska v. J.B.L.&K. of Alaska, Inc.*, supra, at 584–86. We note that the case at bar was determined by cross-motions

for summary judgment. These motions were based solely on the pleadings and uncontested exhibits consisting of Wessells' lease itself and the leases in his chain of title. The extrinsic evidence considered on appeal is thus limited to uncontested evidence and to statutes and other matters of which this court may take judicial notice. As we have stated in *National Bank of Alaska v. J.B.L.&K. of Alaska, Inc.,* supra at 586:

In reviewing the superior court's findings, it should be noted that this Court is not bound by the "clearly erroneous" standard applicable to factual findings made by the court. The evidence relating to the parties' situations at the time they entered the contract was not disputed. Where the facts relating to surrounding circumstances are not in dispute, interpretation of the words of the contract is treated in the same manner as questions of law, and the standard used in reviewing factual findings is inapplicable.

*See also Day v. A & G Construction Co., Inc.*, 528 P.2d 440, 443 (Alaska 1974): *Peters v. Juneau-Douglas Girl Scout Council*, 519 P.2d 826, 834 (Alaska 1974).

**10.** This court has stated in the past that where a term is clear and unambiguous, the intent of the parties is to be ascertained solely from the written instrument. *National Bank of Alaska v. J.B.L.&K. of Alaska, Inc.*, 546 P.2d 579, 582–83 (Alaska 1976); *Port Valdez Co. v. City of Valdez*, 437 P.2d 768, 771 (Alaska 1968). *See Pepsi Cola Bottling Co. v. New Hampshire Ins. Co.*, 407 P.2d 1009, 1013 (Alaska 1965). The above proposition has been the subject of controversy to the extent that it excludes extrinsic evidence from contract analysis. *See National Bank of Alaska v. J.B.L.&K. of Alaska, Inc.*, supra at 583. Where, however, the language is

We focus our attention first on the meaning of the words "reserve the right to grant" to determine whether this wording is ambiguous. Mr. Wessells contends that a "right to grant" is different from a "right to reserve to the state." He argues that the former involves a conveyance to a third party, while only the latter would permit the grantor to utilize the property. Wessells concludes that an interagency land management transfer is not a "grant" to a third party and is therefore not authorized by Paragraph 6 of the lease. Based on the definitions in the legal dictionaries and on the case law,[11] Mr. Wessells' analysis does have technical merit. Paragraph 1 of the lease itself specifies that the "lessor shall mean the State of Alaska," and title has at all times remained in the state. Therefore, Wessells' interpretation is one reasonable interpretation of the lease.

On the other hand, the state claims that the language "reserves the right to grant" was reasonably understood by the parties as permitting the state to transfer a right-of-way from the Division of Lands to the Department of Highways for highway purposes. It suggests that in the context of this transaction, an interagency transfer of an easement was reasonably contemplated as a grant. Looking to the extrinsic evidence in this case, we find that the state's analysis of the lease is also a reasonable interpretation.

We note that the Department of Natural Resources, Division of Lands, and the Department of Highways were created by the legislature as two separate agencies with separate and distinct sources of authority. Although acting on behalf of the state, the Division of Lands and the Department of Highways appear to function as independent entities. Under Chapter 5 of Title 38, the Commissioner of the Department of Natural Resources, who supervises the Division of Lands,[12] has authority to enter into agreements with other state agencies.[13] The Director of the Division may approve contracts for the sale, lease or other disposal of available lands, imposing terms and conditions which he deems in the best interest of the state.[14] The provisions of Title 38 are not applicable, however, to:

> Any power . . . or authority . . . granted to . . . the Department of Highways . . . to acquire, use, or lease . . . real property or any interest in real property.[15]

The authority of the Department of Highways to acquire property or rights-of-way is granted by the legislature under a separate title, AS 19.05.080.

We also consider the fact that the lease was drafted by the state. It would not be reasonable to expect that the Division of Lands intended to provide for easements for third parties but not for other state agencies. It seems more reasonable to conclude that the provision was inserted

---

found to be clear and unambiguous even *after* viewing the extrinsic evidence, the procedure of construing the intent of the parties solely from the written instrument is applicable.

11. A grant of an easement is often defined as a conveyance to another party. *See, e. g., Porto Rico Ry. Light & Power Co. v. Colom,* 106 F.2d 345, 354 (1st Cir.), *cert. denied,* 308 U.S. 617, 60 S.Ct. 263, 84 L.Ed. 516 (1939); *Chicago, Wilimington and Franklin Coal Co. v. Menhall,* 42 F.Supp. 81, 82 (E.D.Ill.1941). Wessells also cites *Rusk v. Grande,* 332 Mich., 665, 52 N.W.2d 548, 551 (1952), which states: "one cannot have an easement in his own estate in fee." While the facts are not on point, the principle is stated.

A "reservation" is defined in cases as a right in favor of the grantor which is created out of or retained in the granted premises. *Phoenix Title and Trust Co. v. Smith,* 101 Ariz. 101, 416 P.2d 425, 431 (1966); *Board of County Comm'ners of Weld County v. Anderson,* 34 Colo.App. 37, 525 P.2d 478, 482 (1974); *Nelson v. Bacon,* 113 Vt. 161, 32 A.2d 140, 145 (1943): ". . . a reservation, moreover, cannot create an estate or interest in a stranger to the deed but can operate only to the benefit of the grantor therein."

12. AS 38.05.020(a).

13. AS 38.05.020(b)(2).

14. AS 38.05.035(a)(14).

15. AS 38.05.030(b).

to provide for flexible highway planning and development. This conclusion is supported by the statutory authority noted above which permits the imposition of conditions or limitations which "will best serve the interests of the state." A condition permitting the state to effectuate an interagency transfer for highway purposes is more consistent with state interests than is a condition which allows the granting of a right-of-way only to a third party taking title in its own name. Moreover, the court may take judicial notice of the fact that the state has a highway program to which it appropriates substantial sums of money each year. To facilitate this program, it is in the interests of the state to avoid paying for the use of lands which it has leased to others. This interest could be realized only if the contested language was inserted to benefit the state as a whole by providing for interagency transfers to the Department of Highways.

▮ Since both the state's interpretation and Wessells' interpretation of the wording "reserve the right to grant" are reasonable, we find this language ambiguous.

Having found this language ambiguous, we proceed to construe the language in accordance with the reasonable expectations of the parties.[16] In performing this function, we must weigh the language of the lease as well as the evidence discussed above. We also consider several established rules of contract interpretation. First, ambiguities are construed against the party that supplied and drafted the form,[17] in this

case, the state. Second, ambiguities are construed against the lessor.[18] Third, a construction of an ambiguous provision which permits the continued performance of a lease is favored.[19]

▮ In spite of these general rules of construction, we are convinced by the extrinsic evidence discussed above that the parties would reasonably expect the term to permit transfers to other state agencies by the state as well as grants of such easements to totally independent third parties. We think that the state's arguments reflect the reasonable expectations of the parties more accurately than do Wessells' technical arguments and hold that the language "reserves the right to grant" contemplates permitting the Department of Highways to utilize the right-of-way.[20]

We focus next on the dispute centering around the words "easement and rights-of-way." We again view this language in light of the two-stage procedure established in *National Bank of Alaska v. J.B.L.&K. of Alaska, Inc., supra,* to determine if the language is ambiguous.

The state argues that the words "easement and rights-of-way" contemplate an easement which is unlimited in size and which, in effect, may terminate the entire estate. The state cites cases holding that a properly-created easement permits the dominant estate to use as much of the servient land as is reasonably necessary to effectuate the purpose of the easement. Where the scope of an easement is unspecified in a grant, it has been held to be "unlimited" so

**16.** Contracts should be interpreted to comply with the reasonable expectations of the parties. *Day v. A & G Constr. Co., Inc.,* 528 P.2d 440, 444 (Alaska 1974); *Hendricks v. Knik Supply, Inc.,* 522 P.2d 543, 546 (Alaska 1974). *See Smalley v. Juneau Clinic Bldg. Corp.,* 493 P.2d 1296, 1305 (Alaska 1972).

**17.** *Modern Construction, Inc. v. Barce, Inc.,* 556 P.2d 528, 530 (Alaska 1976); *Hahn v. Alaska Title Guaranty Co.,* 557 P.2d 143, 144–45 (Alaska 1976); *Pepsi Cola Bottling Co. of Anchorage v. New Hampshire Ins. Co.,* 407 P.2d 1009, 1013 n. 4 (Alaska 1965); *Lumbermen's Mutual Casualty Co. v. Continental Casualty Co.,* 387 P.2d 104, 108 (Alaska 1963). In *Birmingham Trust National Bank v. Midfield Park, Inc.,* 295 Ala.

136, 325 So.2d 133 (1976), the court stated that an ambiguity in an easement would be construed against the landowner at whose insistence the agreement was entered and who prepared the agreement.

**18.** *Blume v. Bohanna,* 38 Wash.2d 199, 228 P.2d 146, 149 (1958).

**19.** *Blume v. Bohanna, supra.*

**20.** In light of our disposition of this issue, we need not address the state's alternative argument that an interagency transfer is a "grant" within the meaning of Paragraph 6.

long as reasonable in relation to the object of the easement.[21] The state's position has technical merit and is one "reasonable interpretation" of this lease.

On the other hand, in light of extrinsic evidence, Wessells' interpretation of the word "easement" is also reasonable. If we were dealing with a tract of land 100 feet square, we would have less difficulty in construing the provision as authorizing a utilization of the entire leasehold estate. Here, however, the leasehold encompasses a twelve-acre tract, roughly triangular in shape, and of considerable width at its base. We do not believe that in Alaska one could reasonably expect a right-of-way of such dimensions. Moreover, AS 19.10.015 declares that all officially proposed and existing highways on public lands not reserved for public use are 100 feet wide. Although the section does not apply to highways which are specifically designated to be wider than 100 feet, it does indicate that

normally, state highways are 100 feet in width. Similarly, AS 19.10.010 dedicates tracts 100 feet wide between each section of land owned or acquired by the state for use as a public highway.[22]

 Mr. Wessells' interpretation of the word "easement" becomes even more persuasive when the word is viewed in the context of other provisions of the lease.[23] Paragraphs 15 and 16 of the lease are the only provisions for cancellation or termination.[24] They do not provide for cancellation or termination by creation of an easement. Analysis of these provisions lends considerable support to the claim that "easement" was not used in a way which contemplated terminating the lease.

 Since both the state and Mr. Wessells have presented reasonable interpretations of the word "easement," we find that the term is ambiguous as to the size of the easement which the parties intended to create.[25] Thus, we must next attempt to

---

**21.** *Missouri Public Service Co. v. Argenbright,* 457 S.W.2d 777, 783 (Mo.1970) ("easement granted or reserved in general terms, without any limitations as to its use, is one of unlimited reasonable use"); *Coleman v. Forister,* 514 S.W.2d 899, 903 (Tex.1974) ("unlimited reasonable use").

**22.** AS 19.10.010 also dedicates a tract four rods wide (sixty-six feet) between all other sections in the state.

**23.** A contract or lease is to be construed within the context of the entire instrument. In *Modern Construction, Inc. v. Barce, Inc.,* 556 P.2d 528, 530 (Alaska 1976), we quoted Professor Williston stating:

> The court will if possible give effect to all parts of the instrument and an interpretation which gives a reasonable meaning to all its provisions will be preferred to one which leaves a portion of the writing useless or inexplicable. (footnote omitted)

In *McBain v. Pratt,* 514 P.2d 823, 828 (Alaska 1973), we stated:

> We are not inclined to approve an interpretation of a contract which creates conflict among its provisions. Wherever possible, repugnant portions of a contract must be harmonized. An interpretation will not be given to one part which will annul another. (footnotes omitted)

**24.** Paragraphs 15 and 16 of the lease specify:

> 15. This lease may be cancelled, in whole or in part, under one or more of the following conditions:

> A. While in good standing by mutual agreement in writing of the respective parties hereto.
> B. If issued in error with respect to material facts.
> C. If the leased premises are being used for an unlawful purpose.

> 16. If the Lessee should default in the performance of any of the terms, covenants or stipulations herein contained or of the regulations promulgated pursuant to Chapter 169, SLA 1959, as amended, and said default shall not be remedied within 30 days after written notice of such default has been served upon the Lessee by the Lessor, the Lessee shall be subjected to such legal action as the Lessor shall deem appropriate, including but not limited to, the forfeiture of this lease. No improvements may be removed by the Lessee during any period in which this lease is in default. In the event that this lease shall be terminated because of a breach of any of the terms, covenants, or stipulations contained herein the annual rental payment last made by the Lessee shall be retained by the Lessor as liquidated damages.

**25.** Again, since the issue of interpreting "easement" was disposed of on the basis of motions for summary judgment in which the parties relied solely on undisputed documentary evidence, there is no necessity for remanding to the superior court to resolve conflicts of fact in the extrinsic evidence. (*See* Footnote 9, *supra.*)

resolve that ambiguity in a manner consistent with the reasonable expectations of the parties.[26] We again look to the extrinsic evidence previously discussed, to the provisions of Paragraph 6 and to other portions of this lease. Also relevant here are the established rules of construction that ambiguities are construed against the party that supplied and drafted the form (the state), that ambiguities are construed against the lessor (again, the state) and that a construction of an ambiguous provision which permits the continued performance of a lease is favored.[27] Against these considerations, we must weigh the state's technical argument that an unspecified easement should be controlled by the doctrine of "unlimited reasonable use." As mentioned previously, under that doctrine, the scope of an easement unspecified in a grant is regarded as unlimited insofar as it is reasonable in relation to the object of the easement.[28]

Under the circumstances of this case, we are persuaded that the extrinsic evidence, rules of construction and provisions of the lease concerning termination outweigh reliance on the "unlimited reasonable use doctrine."[29] In particular, we are influenced by the size of Mr. Wessells' land and the unusual circumstances resulting in the loss of the entire estate. We do not think it reasonable that the parties intended an "easement" to terminate a lease of over twelve acres of land and think that a reasonable expectation under these circumstances would encompass a right-of-way no more than 100 feet wide.

We are further influenced by the fact that the state could easily have eliminated the ambiguity by preparing the lease with adequate specificity to put the lessee on notice of the possibility of termination by means of an easement. Paragraph 6 might have included language authorizing the state to utilize an easement *even though the creation of that easement might terminate the entire estate.*[30] To uphold the termination of the lease under the language actually used in Paragraph 6 would encour-

---

**26.** To assist us in resolving this question, no authority has been presented which is squarely in point. The closest case is *State ex rel. Symms v. Nelson Sand & Gravel, Inc.,* 93 Idaho 574, 468 P.2d 306 (1970). The State of Idaho had granted a lease which included the right to remove gravel. Paragraph 16 of that lease provided:

> That there is expressly reserved the right to permit for joint use such easement or right of way upon, through or in the lands hereby leased, occupied or used as may be necessary or appropriate to the working of the same or of other lands containing mineral deposits, and the treatment and shipment of products thereof by or under authority of the lessor, its lessees or permittees, and for other public purposes.

*Symms, supra* at 309.

An interstate highway was routed across the leased land, and the state contended that no compensation was due for the reason that the right-of-way was being used "for other public purposes." The court held that the reservation was limited to rights-of-way for access to adjacent lands containing mineral deposits and for the purpose of transporting to market minerals mined on other leaseholds. The Idaho court refused to read the phrase "and for other public purposes" literally as it would mean:

> that the state could grant a leasehold one day and appropriate the entire leasehold the next day without any liability to the lessee as long as the appropriation was for a public pur-

pose. It is our conclusion "and for other public purposes" has reference to uses by other lessees of the state lands only.

*Symms, supra* at 310.

While not directly in point, the *Symms* case supports Mr. Wessells' argument, at least to the extent that the Idaho court construed the provision to prohibit a termination of the lease. The trial court found the dissent of District Judge Oliver in *Symms* more persuasive. The dissent would have construed "other public purposes" literally to include the state's acquisition for an interstate highway.

**27.** See Footnotes 17–19, *supra.*

**28.** See Footnote 21, *supra.*

**29.** Where an ambiguity surrounds the word "easement," the doctrine of "unlimited reasonable use" may be at odds with extrinsic evidence or other rules of construction, such as resolving ambiguities against the drafter. While we agree with the general policy behind the unlimited reasonable use doctrine, we will not blindly apply the doctrine and ignore other rules of construction or extrinsic evidence which show that unlimited reasonable use is not a reasonable expectation of the parties. The doctrine of unlimited reasonable use is but one factor to be considered.

**30.** One common way to avoid the ambiguity is stated in 4 Nichols' Law of Eminent Domain

age the use of vague language in leases and would inevitably lead to misunderstandings and legal disputes in the future.[31]

We therefore conclude that the ambiguous provision pertaining to the size of the right-of-way authorized by Paragraph 6 should be resolved by limiting the right-of-way to 100 feet in width.[32] Within that limitation, the right-of-way may follow such route as is reasonably necessary for the state's purposes. Since the state has elected to terminate the entire leasehold estate, the taking of the remaining area should be treated as an inverse condemnation.[33]

The state additionally argues that Mr. Wessells should receive no compensation for his leasehold interest other than for improvements. The argument is based on the fact the lands are school lands,[34] which may be leased only at appraised fair market value and which must be reappraised every five years.[35] From this, the state draws the conclusion that the leasehold can have no value over and above the agreed rentals. The United States Supreme Court, however, disposed of a similar argument involving the taking of Arizona leased school trust lands. In *Alamo Land & Cattle Co., Inc. v. State of Arizona,* 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1 (1976), the court stated that upon a taking of the lands, the trust was to receive the full value of its particular interest which was being condemned, but that the holder of an unexpired leasehold interest in land is also entitled to just compensation for the value of that leasehold interest. During the life of the lease, the trust receives from the lessee the fair rental value, and upon a subsequent condemnation, the trust is entitled to the full value of the reversionary interest that is subject to the outstanding lease, plus the value of the rental rights under the lease. The Supreme Court held expressly, however, that the trust was not to receive

§ 12.42[1] at 12–488 (rev'd 3rd ed. 1976) which states:

It has become customary in drawing leases of valuable city property to insert a so-called "condemnation clause" a provision that, upon the taking by eminent domain of the whole or a part of the premises leased, the term shall come to an end. Under such a lease, the tenant has no estate or interest in the property remaining after the taking to sustain a claim for compensation. . . .

31. We note that this analysis of specificity in the lease is equally applicable to the state's drafting of "reserving the right to grant" discussed in the first part of this decision. In that situation, however, the state was fortunate in that the weight of extrinsic evidence permitted us to resolve the issue in its favor. We nevertheless urge the state to rewrit this provision in order to make it clear and avoid confusion and litigation on this point in the future.

32. We realize that we are to a certain extent reading in the 100-foot requirement relative to this easement. We believe this to be necessary to effectuate the reasonable expectations of the parties. This is consistent with our treatment of land contracts where vagueness and ambiguity must be resolved. In the past, we have not hesitated to fill in gaps in real estate transactions within the context of specific performance cases so as to carry out the reasonable expectations of the parties. *Jackson v. White,*

556 P.2d 530, 534 (Alaska 1976); *Hollaus v. Arend,* 511 P.2d 1074, 1075 (Alaska 1973); *Rego v. Decker,* 482 P.2d 834, 838 (Alaska 1971).

33. *See State v. Crosby,* 410 P.2d 724 (Alaska 1966).

34. Two sections in each township of Alaska were reserved for the support of schools by Congressional act, 48 U.S.C. § 353. The Alaska Statehood Act provided that those lands were granted to the State of Alaska "for the purposes for which they were reserved." PL 85–508, 72 Stat. 339, 343 (1958). The people of Alaska consented to the terms and conditions of the federal act by art. XII, sec. 13 of the Constitution of the State of Alaska. The grant and its acceptance created a trust. *Alamo Land & Cattle Co. v. State of Arizona,* 424 U.S. 295, 96 S.Ct. 910, 47 L.Ed.2d 1, 5–6 (1976); *Lassen v. Arizona ex rel. Arizona Highway Dept.,* 385 U.S. 458, 87 S.Ct. 584, 17 L.Ed.2d 515 (1976).

35. AS 38.05.030(e) provides that the lease of school lands be in accordance with the provisions of the Alaska Land Act, AS 38.05., which provides that "No land may be . . . leased for less than the approved appraised market value . . . ." with exceptions not here applicable. AS 38.05.310. Periodic rental adjustments must be made every five years. AS 38.05.105.

additionally the value, if any, of the leasehold interest.[36]

As to the compensation due the lessee, the court stated:

> Ordinarily, a leasehold interest has a compensable value whenever the capitalized then fair rental value for the remaining term of the lease, plus the value of any renewal right, exceeds the capitalized value of the rental the lease specifies. The Court has expressed it this way:
>
> > "The measure of damages is the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew . . . , less the agreed rent which the tenant would pay for such use and occupancy." *United States v. Petty Motor Co.*, 327 U.S. 372 at 381, 66 S.Ct. 596, 90 L.Ed. 729.

A number of factors, of course, could operate to eliminate the existence of compensable value in the leasehold interest. Presumably, this would be so if the Enabling Act provided, as the New Mexico-Arizona Act does not, that any lease of trust land was revocable at will by the State, or if it provided that, upon sale or condemnation of the land, no compensation was payable to the lessee. The State, of course, may require that a provision of this kind be included in the lease. (citations omitted) [37]

■■■ Alaska's provision limiting compensation to the value of improvements is thus valid as to the portion of the leasehold taken which we have held properly to have been reserved for a right-of-way. As to the balance of the leased premises, Mr. Wessells is entitled to compensation on the basis of the *Petty Motor Co.* formula quoted in *Alamo, supra.* It may be presumed that the lease rent was originally established at fair market value in accordance with statutory requirements. The rental value may, however, have increased since the last reappraisal. If so, the increase creates a compensable value.[38] Such increase may occur due to changes in economic conditions or possibly by a creative use made of the premises which was not reasonably anticipated at the time the rentals were established. In determining damages, the court must consider the state's right of reappraisal which arises every five years. We cannot, however, agree with the state's contention that the trust imposed on school lands precludes payment other than for improvements.

We hold that to the extent, if any, that Mr. Wessells may prove such damages, he is entitled to additional compensation.[39]

REVERSED AND REMANDED.

---

**36.** *Alamo, supra,* 424 U.S. at 303, 96 S.Ct. at 916, 47 L.Ed.2d at 9.

**37.** *Id.* 424 U.S. at 304, 96 S.Ct. at 916, 47 L.Ed.2d at 9.

**38.** *Id.,* 424 U.S. at 305, 96 S.Ct. at 917, 47 L.Ed.2d at 10.

**39.** The author of this opinion, with whom Justice Rabinowitz agrees, believes that in all cases, serious consideration should be given to permitting the introduction of relevant extrinsic evidence to determine the reasonable expectations of the parties. An analysis that initially uses extrinsic evidence solely for the purpose of ascertaining whether a provision is ambiguous and then focuses on the same evidence to resolve the ambiguity seems artificial and unduly cumbersome. Moreover, this two-tiered approach offers little advantage over one which initially turns to extrinsic evidence for such light as it may shed on the reasonable expectations of the parties.

Under the approach suggested here, the courts may hear all relevant circumstances bearing on the interpretation of a disputed term. This should better enable them to attain the ultimate goal of interpreting the language in accordance with the reasonable expectations of the parties. As Professor Corbin points out:

> [S]eldom in a litigated case do the words of a contract convey one identical meaning to the two contracting parties or to third persons. Therefore, it is invariably necessary, before a court can give any meaning to the words of a contract and can select one meaning rather than other possible ones as the basis for the determination of rights and other legal effects, that extrinsic evidence shall be heard to make the court aware of the "surrounding circumstances," including the persons, objects, and events to which the words can be applied and which caused the words to be used.

2 Corbin, Contracts § 536 at 28 (1960). *See also* " 'Meaning' in the Law of Contracts," E. Allen Farnsworth, 76 Yale L.Rev. 939 (1967).

If permitted to consider relevant extrinsic evidence, when offered, in all cases, the courts would still apply an objective test as to the meaning of the terms. Obviously, the more carefully and succinctly a provision is drafted, the less importance would be given to such extrinsic evidence. Nevertheless, the benefits of utilizing all relevant materials seem to outweigh additional court time, if any, involved in receiving the evidence. It is questionable, however, whether the suggested approach will, in fact, absorb additional court time since it would eliminate the lengthy and repetitious arguments as to whether a provision is ambiguous.