INTERIOR ENERGY
CORPORATION, Appellant,

v.

ALASKA STATEBANK, Appellee.

Nos. S–2309, S–2584.

Supreme Court of Alaska.

April 14, 1989.

Rehearing Denied May 1, 1989.

James N. Reeves, Bogle & Gates, Anchorage, for appellant.

Frederic E. Brown, Fairbanks, for appellee.

Before MATTHEWS, C.J., and BURKE and COMPTON, JJ.

## OPINION

MATTHEWS, Chief Justice.

## INTRODUCTION

This case involves two appeals which arose from a real property foreclosure. In S–2309, the foreclosure purchaser and former tenant disagree as to ownership of fixtures on the property. In S–2584, the parties disagree as to the amount of post-foreclosure rent owed by the former tenant to the foreclosure purchaser.

## FACTS AND PROCEEDINGS

On March 27, 1987, Alaska Statebank acquired title to the Beaver Brook Mall, by foreclosure sale of the deed of trust which the Bank held securing a construction loan to the Mall's owner, AREO Company. Interior Energy Corporation operated a convenience grocery store, service station, and bulk fuel storage and loading facility at the Mall under several long-term leases with AREO.

This action for forcible entry and detainer was brought on April 29, 1987. Trial was commenced on May 5, 1987 under the accelerated procedures set forth in Civil Rule 85. After the first day of trial the parties stipulated that Interior would vacate the premises at the end of the month. Thereafter, the focus of the trial was the

1. The Bank does not appeal the items that were awarded to Interior.

2. Interior also appealed the court's order designating the Bank as the prevailing party on the partial summary judgment for post-foreclosure

ownership of certain trade fixtures on the premises. At the conclusion of four more days of trial, the court orally announced its decision awarding some of the disputed items to the Bank and some to Interior.

A final judgment concerning the award of the trade fixtures was entered pursuant to Civil Rule 54(b), from which Interior has appealed.[1] The items in dispute on appeal are a kitchen sink and cabinet unit; various component parts of walk-in coolers and freezers (hereafter "the refrigeration units"); underground fuel storage tanks and related equipment, including a water-pump, fuel pumps, and a canopy over the fuel pumps (hereafter collectively "the tank farm"); outside floodlights; a water softener; the fence around the property; and the pole for the truck-stop sign.

The other appeal concerns the amount of rent due for the period between the foreclosure sale and the eviction. The foreclosure sale took place on March 27, 1987, and Interior vacated the premises on June 2, 1987. Interior concedes that it owes rent for this period, but argues that the rent should be based on fair market value rather than on the rent specified in the AREO/Interior leases. The Bank argues it is entitled to the lease rental rate.

After the judgment relating to trade fixtures was entered, the Bank moved for partial summary judgment contending that it was entitled to judgment at the lease rental rate for the post-foreclosure period. This motion was granted and the ensuing partial summary judgment was certified as a final judgment under Civil Rule 54(b). Interior appeals from this partial summary judgment and challenges the Rule 54(b) certification.[2]

## DISCUSSION

### I. *Removal of fixtures from leased premises*

The threshold issue in trade fixture cases is who purchased and installed the

rent on the grounds that this determination should await the conclusion of the entire case in the trial court. The Bank has agreed that this determination should be made at the end of the case and the order is vacated in this respect.

disputed fixtures. If it was not the tenant who installed them, or succeeded in interest to them from a former tenant who did, he or she has no right to remove them. *See generally* 5 R. Powell & P. Rohan, *The Law of Real Property* ¶ 651[4], at 57–17 (1987) (hereafter "Powell").

In this case it was unclear who actually owned the fixtures when they were installed. This confusion was the product of the fact that all of the four partners of AREO, the owner of the Mall, were shareholders of Interior, the tenant, and together owned 95% of Interior's stock. It was difficult to sort out at the construction stage which entity did which work. The building and fixtures were constructed simultaneously. It was not a situation where AREO first constructed the buildings and Interior then installed the fixtures.

To further complicate matters, the construction work was performed by Dennis Wise, a partner of AREO and a shareholder of Interior. Because of his close relationship to both entities, there were no written contracts for the construction work. Wise apparently proceeded with the construction without segregating AREO's work from Interior's.

■ This confusion as to actual ownership is not of great importance in this case, because Interior is estopped from asserting ownership over most of the disputed items. The trial court found that several documents represented that items in dispute would be "part of the realty" which the Bank was "entitled to rely on." These findings are not challenged on appeal, and they are, as we explain below, amply supported by the record. Because estoppel was not mentioned by name by the trial court and it is difficult to define the scope of its role in the court's decision, we also note that the record will not reasonably support any decision other than estoppel as to the items hereinafter noted.

The Bank loaned money to AREO for construction of the Beaver Brook Mall based on AREO's representations to it that the Mall would include a "bulk fuel storage and dispensing facility." The Bank reiterated this belief in its loan commitment letter.[3] The Deed of Trust and Security Agreement provided that on default the Bank would have the power to sell "all buildings, structures, improvements, fixtures, and other articles of property now or hereafter attached to the Property...."

The Construction Loan Agreement signed by the Bank and by AREO incorporated by reference a document entitled "Contractor's Cost Breakdown, Beaverbrook, Wise Enterprises." Included in this cost breakdown was the entry "Bulk Fuel ... $205,000."

AREO made other representations to the Bank which created the impression that AREO would be the owner of many of the disputed fixtures. In a letter to the Bank AREO stated that it intended to lease out the self-service gas station, bulk and retail fuel facilities, grocery and liquor store, and truck storage barn. AREO also provided an independent appraisal of the proposed project to the bank. The appraisal was based on AREO's ownership of a retail and bulk fuel storage and dispensing facility:

The bulk fuel storage and dispensing facility will be comprised of six, 10,000 gallon buried fuel tanks, associated plumbing and piping, three concrete islands with dispensing pumps. There will be high-volume diesel fuel dispensing pumps on one island; a second island with dispensers for regular and unleaded gasoline and diesel fuel; and a third island with dispensers for regular and unleaded gasoline only. There will also be a facility for bulk unloading and loading of heating fuel oil and a 20 foot by 20 foot pumphouse to control the pumps and associated plumbing.

The appraisal also included, in its "Summary of Cost Approach," these entries:

**3.** The letter stated, in pertinent part: *"Purpose:* To construct a 2–story office/retail sales building, warehouse and shopping mall. There will also be a bulk fuel storage and dispensing facility."

| Bulk Fuel Facility | $125,000 |
| Tanks and Plumbing | |
| Pumps, Canopies, | |
| Monitoring Equipment | 80,000 |
| | |
| Plus: Site Improvements | |
| (fencing, exterior lighting, | |
| pavement) | 200,000 |

In short, the record supports the trial court's finding that many of the items in dispute were represented to the Bank to be part of the real estate. AREO's representations led the Bank to believe that AREO would own all of the structures and fixtures reasonably necessary to the operation of a bulk and retail fuel facility and a grocery and liquor store. The Bank relied on these representations in deciding to lend money to AREO.[4]

▮ The elements of equitable estoppel are the assertion of a position by conduct or words, reasonable reliance thereon by another party, and resulting prejudice. *Merdes v. Underwood*, 742 P.2d 245, 248 (Alaska 1987). It is a fundamental principle of property law that where one who owns property, with full knowledge of his rights, permits another to sell or pledge it, he will be equitably estopped from asserting his title as against a third person who has acted in good faith and has been misled by the true owner's acquiescence. *See Ralls v. Fouraker*, 109 Idaho 488, 708 P.2d 893, 896 (1985); *Belleville v. Davis*, 262 Or. 387, 498 P.2d 744, 749 (1972).

In this case Interior had full knowledge of AREO's representations to the Bank. The four members of the AREO partnership owned 95% of Interior's stock. In a situation such as this, the knowledge of the shareholders will be imputed to the corporation. *See Keen v. Keen*, 113 A.D.2d 964, 493 N.Y.S.2d 636, 638 (1985); *Johnson v. Rich*, 150 Cal.App.2d 740, 310 P.2d 980, 986 (1957). *See also* W. Fletcher, *Cyclopedia*

*of the Law of Corporations* § 809 (1986). Because Interior made no effort to controvert AREO's representations to the Bank, and because the Bank relied on those representations, Interior is estopped from asserting that it was the true owner of the fixtures covered by AREO's representations.

The tank farm, the refrigeration units, the lights, the pole for the truck stop sign, and the fence around the property were within the scope of the representations made by AREO to the Bank. The tank farm is an integral part of a bulk and retail fuel facility, as are the lights, the pole, and the fence. Similarly, the refrigeration units are an integral part of a grocery and liquor store. Finally, the water softener must also remain. The trial court found that it is part of the intrinsic water system of the premises. Interior is estopped from asserting ownership of these items.

The Bank is thus entitled, under the above analysis, to everything but the kitchen sink.[5] Because this item is not within the scope of AREO's representations to the Bank, its ownership depends on the law of trade fixtures.

▮ Interior contends that the kitchen sink/cabinet is a trade fixture, and that it has a right to remove it. Trade fixtures have been defined as property installed by a tenant at his own expense, during the term of the lease, to carry on the business for which the realty was leased. *Shell Oil Company v. Capparelli*, 648 F.Supp. 1052, 1055 (S.D.N.Y.1986). *See also* 5 Powell ¶ 653, at 57–45. Traditionally, a commercial tenant may remove trade fixtures from the leased property so long as he or she does not intend at the time of affixation to relinquish ownership of the item. *Id.;* 5 *The American Law of Property* § 19.11, at

**4.** The Construction Loan Agreement provided: "All ... representations ... made ... in documents delivered in support of the loan request shall be deemed to have been material and relied on by the BANK and shall survive the execution and delivery to the BANK of the NOTE and the disbursements hereunder."

**5.** The item consists of a kitchen cabinet/sink unit which is attached to the floor and wall, and connected to plumbing facilities.

40 (1952). In the absence of an agreement to the contrary, courts presume that the tenant did not intend to donate the affixed items to the landlord. *See Neely v. Jacobs,* 673 S.W.2d 705, 707–08 (Tex.App.1984).[6]

The Restatement (Second) of Property (Landlord and Tenant) approach reflects the modern trend in this area and in our view presents a sound approach to the law of fixtures. Section 12.2(4) would allow the tenant to remove any permissible annexations so long as the landlord and tenant have not agreed otherwise and so long as the freehold can be restored to its former condition. Restatement (Second) of Property (Landlord and Tenant) § 12.2 (hereinafter "Restatement"). The landlord may require the tenant to post adequate security to ensure restoration. Restatement § 12.2 comment s at 449. *See, e.g., Consiglio v. Carey,* 12 Mass.App. 135, 421 N.E.2d 1257, 1260 (1981). There is no reason to require a tenant to abandon property he has affixed to the leased premises so long as he can restore the premises to its former condition.[7]

■ Applying this rule to the instant case, Interior is entitled to the kitchen cabinet/sink if it can show that it installed it, did not intend to donate it to the landlord, and could now remove it and restore the premises to their former condition. The trial court granted the cabinet/sink to the Bank based on its conclusion that the unit is not necessary for Interior's business, and therefore is not a removable trade fixture. This reason does not square with the law of trade fixtures set forth above. Regardless of whether the cabinet/sink was necessary for Interior's business, the court should have based its decision on who originally installed the unit, on the parties' intent, and on whether it could be removed and the premises restored.

## II. *Post–Foreclosure Rent Claim*

### A. Propriety of Entry of Final Judgment

■ Interior contends that the trial court abused its discretion by entering judgment on the post-foreclosure rent claim, pursuant to Civil Rule 54(b). In *Johnson v. State,* 577 P.2d 706 (Alaska 1978), we stated that "[t]he general rule governing appeals is that they may be taken only after the entire case is disposed of on all substantive issues." *Id.* at 709. While Civil Rule 54(b) was enacted to facilitate appeals involving multiple claims or multiple parties, *id.* at 710, that rule may not be invoked indiscriminately:

> There are two important limitations on the use of Rule 54(b). The first is that there must be a final decision on at least one claim or as to the entire interest of at least one party. The single judicial unit may be subdivided no further than that. Second, there must be a good reason for using Rule 54(b).

*Id.* The judgment in this case satisfies both parts of the *Johnson* test.

The judgment in this case disposes of the entire post-foreclosure rent claim. And, as this was the second Rule 54(b) certificate in this case, the policy against piecemeal appeals was not violated by this certificate. The question was rather whether it was better to require this portion of the case to remain with the pre-foreclosure rent claim, which was yet to be litigated, or to allow it to proceed on appeal, presumably (and as it turned out) consolidated with the appeal of

---

6. We note that the lease agreements each contain a clause to the effect that alterations will become the property of the landlord. On remand the parties should address whether this clause applies to the cabinet/sink.

7. The Bank's cases in support of a more strict rule of fixtures, *State Highway Comm'n v. Empire Bldg. Material Co.,* 17 Or.App. 616, 523 P.2d 584 (1974); *State, Dep't of Revenue v. Boeing Co.,* 85 Wash.2d 663, 538 P.2d 505 (1975), are inapposite in that they apply to eminent domain and taxation, respectively, and do not involve landlord-tenant disputes. The factors to consider in determining whether an object is a removable fixture are different in different settings. *Compare* 5 Powell ¶¶ 651[5] (taxation) and [6] (condemnation) *with* 651[4] (landlord-tenant). *See also Consiglio v. Carey,* 12 Mass.App. 135, 421 N.E.2d 1257, 1259 (1981).

the earlier judgment regarding ownership of the trade fixtures. There is a relationship between the trade fixture appeal and the present question, because if fair rental value is to be the measure, as Interior contends, that value will vary depending on the ownership of the trade fixtures.[8] Under these circumstances, the superior court did not abuse its discretion in entering the certificate.

### B. The Post–Foreclosure Rent Claim

The superior court granted partial summary judgment in favor of the Bank, holding that Interior owed rent at the rate provided in its leases with AREO for the period from the Bank's acquisition of the property on March 27, 1987 until Interior's eviction for failure to pay rent on June 2, 1987. The amount of the judgment is $45,-712.25, plus interest. Interior contests this decision, arguing that it should owe only fair market rental value, not the rate provided in the leases.

The effect on a leasehold interest of foreclosure of a deed of trust which antedates the leasehold interest is a question of first impression in Alaska. Alaska Statute 34.-20.090(b) provides that a purchaser of property at a foreclosure sale is entitled to possession of the property as against the party who executed the deed of trust or any person claiming by, through or under that party. The logical effect of this right of possession, at least where the purchaser chooses to exercise his right, is to extinguish the existing leasehold interest. This approach is consistent with the approach taken in other jurisdictions. *See, e.g., Reilly v. Firestone Tire & Rubber Co.,* 764 F.2d 167 (3d Cir.1985) (construing Pennsylvania law); *People v. Little,* 143 Cal.App.

3d Supp. 14, 192 Cal.Rptr. 619 (1983); *Silverstein v. Schak,* 107 Ill.App.3d 641, 63 Ill.Dec. 370, 437 N.E.2d 1292 (1982).

■ If, absent an agreement with the foreclosure purchaser, the lessee remains in possession after the sale, his status is as a tenant by sufferance. *See Andreola v. Arizona Bank,* 26 Ariz.App. 556, 550 P.2d 110, 112 (1976); *First Fed. Sav. & Loan Ass'n of Atlanta v. Shepherd,* 131 Ga.App. 692, 206 S.E.2d 571 (1974), *aff'd,* 232 Ga. 846, 209 S.E.2d 184 (1974). The Restatement of the Law of Property, § 22, at 53 (1936) states:

> An estate at sufferance is an interest in land which exists when a person who had a possessory interest in land by virtue of an effective conveyance, wrongfully continues in the possession of the land after the termination of such interest, but without asserting a claim to a superior title.

As a tenant by sufferance, such a lessee would be liable to the purchaser not for contract rent, but for the fair rental value of the premises. *Legler v. Legler,* 149 Ind.App. 447, 273 N.E.2d 303 (1971); R. Schoshinski, *The American Law of Landlord and Tenant* § 2:21, at 69 (1980).

The superior court held that Interior owed the Bank the rent specified in the leases, apparently based on our decision in *Altman v. Alaska Truss & Mfg. Co., Inc.,* 677 P.2d 1215 (Alaska 1983).[9] In *Altman* we stated that a tenant who continues to use property after clear notice of the landlord's intent to charge rent without protesting the rental charge impliedly agrees to pay the demanded rent. *Id.* at 1227. The holding in *Altman* is premised on conduct by both the landlord and the tenant which

---

8. This relationship was expressed by Interior in its opposition to the Bank's motion for partial summary judgment relating to post-foreclosure rent. Interior stated:

 There is a genuine issue of material fact as to the amount of rent that would fairly compensate the Bank for IEC's occupancy following the foreclosure. This issue of fact depends, in turn, on the ultimate resolution of the fixtures question pending for decision by the Alaska

Supreme Court on appeal, because the value of property to the tenant depends upon whether those fixtures were a part of the leasehold or were owned by the tenant.

9. Although the superior court's order did not state its legal rationale, the Bank argued only one theory in its motion. We assume that the court based its order on this theory.

amounts to an implied agreement to pay the demanded rent.

 In our view the record shows an implied agreement to pay the rent demanded. After the March 27, 1987 sale, the Bank on April 1, 1987 sent a certified letter to each of the AREO partners and to Vernon Frol, the manager of Interior, and the only shareholder of Interior who was not an AREO partner, which contained a demand "that all rents due under rental agreements and or leases be transferred to the Bank." Thereafter, on April 9, 1987 another certified letter was sent by the Bank to Interior referring to the leases and demanding rent for April, as well as the rent for the four prior months.

On appeal Interior argues that the letters of April 1 and 9 are insufficiently clear statements of the Bank's intent. This contention is without merit as to the April 9 letter. The lease to each of the tenant areas occupied by Interior is there explicitly referred to, and a total figure of rent due at lease rates is stated.

Interior also argues that the facts do not clearly show implied acceptance of the proposed rental amount. Again, we disagree. Interior did not protest the letter of April 9 at any time during its continuing occupancy of the premises. In fact counsel for Interior, on May 5, 1987 at the initial hearing on the forcible entry and detainer aspect of this case, explicitly affirmed that Interior is "in possession under a valid lease; that the lease is in effect, it's never been terminated." Counsel further stated that "the lease would continue on regardless of any foreclosure action...." Interior also implicitly acknowledged that the leases would govern, in its answer to the initial complaint. Interior alleged that it was entitled to continued possession of the premises. Interior could only have had a right to continued possession of the premises under the leases, not as a tenant at sufferance.

CONCLUSION

The judgment in No. S–2584 is AFFIRMED. The judgment in No. S–2309 is AFFIRMED, except as to ownership of the kitchen cabinet/sink. As to that item, the judgment is REVERSED and the case is REMANDED for further proceedings in accordance with this opinion.

RABINOWITZ and MOORE, JJ., not participating.