NORTH PACIFIC PROCESSORS, INC.,
d/b/a Sitka Sound Seafoods, and John
Sevier, Appellants/Cross–Appellees,

v.

CITY AND BOROUGH OF YAKUTAT,
ALASKA, a Municipal Corporation,
Appellee/Cross–Appellant.

Nos. S–11072, S–11091.

Supreme Court of Alaska.

April 15, 2005.

As Corrected on Rehearing June 29, 2005.

North Pacific Processors, Inc. (NPPI) and its predecessor, Sitka Sound Seafoods, Inc., for many years. This appeal concerns disputes about Yakutat's contractual "first option to purchase" items installed on the leased property by the lessees, and the appropriate purchase price. We hold that the superior court did not clearly err in finding after trial that the disputed items are "structural improvements or additions" within the meaning of the leases, and are therefore subject to the lessor's option to purchase. We reverse and remand, however, for further consideration of the appropriate purchase price for some items, because it was error to rely on an internal NPPI accelerated depreciation schedule to set the purchase price for those items.

## II. FACTS AND PROCEEDINGS

Since 1976 the City of Yakutat (later the City and Borough of Yakutat) has leased to a series of lessees property consisting of a seafood processing plant, a machine shop, two docks, and two icehouses. The plant was a fully functioning seafood processing plant when Yakutat acquired it. Yakutat began leasing the property to Sitka Sound Seafoods, Inc. in 1986. Directly pertinent here are the 1986 and 1988 leases between Yakutat and Sitka Sound; also potentially germane are the 1992 lease between Yakutat and Sitka Sound and the 1997 lease between Yakutat and Sitka Sound's successor, NPPI. NPPI succeeded to Sitka Sound's interests in 1996.

Sitka Sound expanded the processing plant's freezing capacity in 1987 and improved the refrigeration and electrical systems. Yakutat agreed to pay more than $277,000 for this work. The Sitka Sound letter asking Yakutat for permission to undertake the project stated that it would "have a 20 year life expectancy." Sitka Sound also upgraded the refrigeration system at the "little dock" icehouse in 1988, and the letter it sent Yakutat proposing this upgrade likewise stated that this project would "have a useful life of 20 years."

The 1986 and 1988 Yakutat–Sitka Sound leases were in effect in 1987 and 1988, when the items in dispute in this appeal either

Anthony M. Sholty, Faulkner Banfield, P.C., Juneau, for Appellants/Cross–Appellees.

Sara E. Heideman, Hedland, Brennan, Heideman & Cooke, Anchorage, for Appellee/Cross–Appellant.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, and FABE, Justices.

*OPINION*

EASTAUGH, Justice.

## I. INTRODUCTION

The City and Borough of Yakutat leased a fish-processing plant and cold storage to

were installed or were allegedly purchased by Sitka Sound from the previous lessee. Per lease section 12, titled "Improvements," the lessor under both leases had the "first option to purchase" any "structural improvements and additions" made to the premises by the lessee "at cost based upon straight line depreciation." Neither lease defined the term "structural improvements and additions." Both stated that the lessee was to return the property to Yakutat in the same condition in which the lessee had received it. We discuss the lease language in more detail below.

The other two leases, the 1992 lease between Yakutat and Sitka Sound, and the 1997 lease between Yakutat and NPPI, are also potentially germane. Neither of these leases directly applies here, because the disputed items were installed before these two leases took effect. They nevertheless provide guidance in interpreting the two applicable leases.

In 2002 NPPI notified Yakutat that NPPI would not renew the lease then in effect. It then sent Yakutat an extensive list of assets it stated Sitka Sound owned and informed Yakutat by letter that the listed items were available for sale to Yakutat; NPPI valued the items collectively at about $1,500,000. The letter asked Yakutat which items it wished to purchase. During discussions, however, NPPI informed Yakutat that the listed items were for purchase on a package basis, and that if Yakutat did not buy all of them, NPPI would remove them from the plant.

Yakutat sought injunctive and declaratory relief to prevent NPPI from removing some eighty items on NPPI's sale list. The superior court granted Yakutat a preliminary injunction and then held a trial to determine which items, if any, NPPI was entitled to remove subject to Yakutat's option to purchase. After considering extrinsic evidence the court decided that Yakutat had "the right to purchase structural improvements and additions ... at a straight line depreciation price over a term agreed upon." This price was twenty-five percent of the original cost of the projects at the main processing plant and the little dock. The court also decided

that Yakutat could purchase certain other disputed items at "their straight line depreciated value, in accordance with the schedule set out in Exhibit BP," an NPPI internal depreciation expense report. The court entered findings of fact and conclusions of law and a final judgment.

NPPI's appeal concerns only some of the items installed in 1987 and 1988. There are five compressors in the main building on the leased property. One of these is a Vilter compressor; there is no dispute that Yakutat owns the Vilter compressor. The main building also contains two Mycom compressors. NPPI alleges that Sitka Sound bought those two compressors from the previous lessee; it also alleges that Sitka Sound installed a third Mycom compressor and a Sullaire compressor in the main building. The parties dispute whether Yakutat has the right to purchase the three Mycom compressors and the Sullaire compressor.

There is also a dispute about three Vilter compressors at the little dock. The other disputed items are condensers, ammonia receivers, blast freezer coils, and refrigeration valves. NPPI claims that it owns all these items and has the right to remove them; Yakutat claims that it has the right to purchase the items and disputes whether NPPI has a right to remove them.

NPPI appeals. Yakutat cross-appeals, contending that the superior court erred by failing to award it full attorney's fees.

After the superior court issued its decision, Yakutat exercised its option to purchase certain items for about $174,000, and also purchased other items from NPPI, for about $124,000 more. NPPI, concerned that the bill of sale might affect its appeal, wrote Yakutat to make it clear that the bill of sale would not prejudice NPPI's appeal. Yakutat agreed "that if NPPI appeals, [Yakutat] will not use the executed Bill of Sale as independent grounds to argue that NPPI is not entitled to relief on appeal." The sale was then consummated and NPPI deposited Yakutat's checks. Yakutat has asked us to dismiss NPPI's appeal; Yakutat invokes the acceptance of benefits doctrine and alterna-

tively argues mootness because the judgment was not stayed.

## III. DISCUSSION

### A. Standard of Review

■■■ "[L]eases are contracts and should be interpreted according to contract principles."[1] We use our independent judgment when reviewing the trial court's interpretation of a contract.[2] To the extent a trial court's findings are based on extrinsic evidence, we apply the clearly erroneous standard.[3] We also review questions of fact under the clearly erroneous standard.[4] A finding of fact is clearly erroneous if it leaves the court with a "definite and firm conviction on the entire record that a mistake has been made."[5] In reviewing factual findings, we view "the evidence in the light most favorable to the prevailing party below."[6]

### B. The Court Did Not Clearly Err in Finding that Yakutat Had the First Option To Purchase the Disputed Items.

■■■ The 1986 and 1988 leases gave Yakutat a "first option to purchase" "[a]ny structural improvements and additions" made to the premises during the term of the leases. The superior court held that the disputed items were structural improvements or additions and concluded that the leases consequently gave Yakutat the right to purchase the items from NPPI at cost, based upon straight line depreciation. NPPI contends

that the court erred in ruling that Yakutat had an option to purchase these items.

This dispute revolves around the meaning of the term "structural improvement and additions" in the 1986 and 1988 leases.

■■■ Determining the meaning of a term in an agreement involves a two-stage analysis.[7] The first stage requires looking to "both the language of the lease and extrinsic evidence to determine if the wording of the lease is ambiguous."[8] Disagreement between the parties regarding the interpretation of a contract term does not necessarily create ambiguity.[9] "An ambiguity exists only where the disputed terms are reasonably subject to differing interpretation after viewing the contract as a whole and the extrinsic evidence surrounding the disputed terms."[10] If the language is ambiguous, the second stage calls for considering extrinsic evidence to attempt to resolve the ambiguity,[11] but "[i]f the lease is clear and unambiguous, we construe it solely according to its written terms."[12]

#### 1. The pertinent lease terms are ambiguous.

We first determine from the lease language and extrinsic evidence whether the phrase "structural improvements and additions" is ambiguous.

NPPI contends that the leases distinguished between structural improvements and additions on the one hand, and machinery, equipment, and facilities, in whatever manner affixed to the real property, on the other; it claims that only the former items

1. *Rockstad v. Global Fin. & Inv. Co.*, 41 P.3d 583, 586 (Alaska 2002).

2. *Interior Reg'l Hous. Auth. v. James*, 989 P.2d 145, 148 n. 12 (Alaska 1999).

3. *Fairbanks N. Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1024–25 (Alaska 1986).

4. *Dunn v. Dunn*, 952 P.2d 268, 270 (Alaska 1998).

5. *Id.* (quoting *R.F. v. S.S.*, 928 P.2d 1194, 1196 n. 2 (Alaska 1996)).

6. *Klosterman v. Hickel Inv. Co.*, 821 P.2d 118, 122 (Alaska 1991).

7. *Wessells v. State, Dep't of Highways*, 562 P.2d 1042, 1046 (Alaska 1977).

8. *Id.*

9. *Id.; see also Rockstad v. Global Fin. & Inv. Co.*, 41 P.3d 583, 586 (Alaska 2002).

10. *Wessells*, 562 P.2d at 1046.

11. *Id.*

12. *Rockstad*, 41 P.3d at 586; *see also Wessells*, 562 P.2d at 1046; *Nat'l Bank of Alaska v. J.B.L. & K. of Alaska, Inc.*, 546 P.2d 579, 582–83 (Alaska 1976).

were subject to Yakutat's option to purchase. NPPI argues that the compressors, condensers, ammonia receivers, blast freezer coils, and refrigeration valves are attached by metal piping, electrical cables, or wires and are "readily removable." It argues that the leases "did not define structural improvement beyond discussing what they are not"; NPPI therefore refers us to this law dictionary definition of "structural alteration": "such an alteration of a building as changes the physical structure so materially as to create a different building." [13]

NPPI asserts that Yakutat and Sitka Sound agreed that Sitka Sound could remove the equipment it installed as long as it restored the premises to their condition before the equipment was installed. It contends that NPPI planned to leave a working refrigeration system that "would be a better composition than what [Yakutat] had before [the lessee installed the equipment]." NPPI argues that courts have recognized that it would be inequitable "for a lessee to make extensive structural repairs that would revert to the benefit of the lessor." [14] It claims the option to purchase avoids inequities.

Yakutat responds that NPPI's interpretation of the leases would give Yakutat the option of purchasing only items that are physically nonremovable-items that if removed would cause the building to collapse or be changed into a different building. It asserts that these items are not removable under any theory, and in case of repossession Yakutat would acquire them without exercising any option. Yakutat argues that NPPI's theory would therefore make the option to purchase language superfluous, contrary to rules of contract construction.

Yakutat argues that *Interior Energy Corp. v. Alaska Statebank* supports its position, because that opinion states that tenants may remove items they installed "so long as the landlord and tenant have not agreed otherwise." [15] It contends that here the parties testified that they had agreed otherwise, establishing an intention that the refrigeration

components be subject to Yakutat's option to purchase.

### a. The leases' words support NPPI's reading.

In determining whether ambiguity exists, we first turn to the lease language. Yakutat and Sitka Sound entered into the first relevant agreement, entitled "License Agreement," in 1986. This "1986 lease" was to end December 31, 1988. It applies to the renovations of the processing plant's freezing capacity, because Sitka Sound undertook those renovations in 1987. It appears that Sitka Sound purchased the other disputed items at the processing plant from the previous lessee in 1987, making these items subject to this lease. Section 12 of this agreement stated in full:

Licensee may from time to time, and at its own expense, make or construct such additions to or improvements or alterations in and about the licensed premises and its appurtenances, whether structural or otherwise, and install such machinery, equipment and facilities as it may consider proper or advisable in connection with the use and operation of the premises, except that no structural alteration to any part of the licensed premises may be carried out without the prior written consent of the City. *Licensee shall have the right at the termination of this license to remove any such machinery, equipment, and facilities belonging to it;* provided, however, that after such removal Licensee shall, at its sole expense, restore the licensed premises to their condition prior to the installation of such machinery, equipment and facilities.

*Any structural improvements and additions* made to the licensed premises by Licensee during the term of this license shall be preceded by mutual agreement of the expected useful life of the particular improvement or addition which shall under no circumstances exceed twenty (20) years, and shall stipulate that *City has first op-*

---

**13.** BALLENTINE'S LAW DICTIONARY 1225 (3d ed.1969).

**14.** *Polk v. Armstrong*, 91 Nev. 557, 540 P.2d 96, 98 (1975).

**15.** *Interior Energy Corp. v. Alaska Statebank*, 771 P.2d 1352, 1356 (Alaska 1989).

*tion to purchase the said improvement or addition at cost* based upon straight line depreciation over the remaining agreed-upon useful life of the improvement or addition.

*All property belonging to Licensee placed upon the licensed premises, whether such property consists of furniture, machinery, equipment, appliances, fixtures or otherwise, and whether property is fixed to the real property by means of piping, wiring, bolts or otherwise, shall belong solely to Licensee and remain so subject to the right of removal herein pro-*vided but in the event of removal, the premises shall be restored to their original condition by Licensee.

(Emphasis added.) Section 13 stated, in part: "Licensee shall return the licensed premises to City in the same condition in which received (or, if altered by Licensee, the licensed premises shall be returned in such altered condition), reasonable wear and tear, and use thereof . . . excepted."

Sitka Sound and Yakutat entered into a successor lease in January 1988; this "1988 lease" was in effect through December 31, 1992. It applies to the upgrades at the little dock icehouse, because Sitka Sound appears to have carried out that upgrade in 1988. This lease contained sections virtually identical to the sections quoted above with only one material difference: the first paragraph of section 12 of the 1988 lease stated:

Lessee shall not make or construct any additions to or improvements or alterations in and about the leased premises and its appurtenances, whether structural or otherwise, or install machinery, equipment and facilities without the prior written consent of Lessor . . . . [A]ll such work shall be at the expense of Lessee. Subject to Section 33 [Option to Renew], Lessee shall have the right at the termination of this lease to remove any such machinery, equipment and facilities belonging to it; provided, however, that after such removal Lessee shall, at its sole expense, restore the leased premises to their condition prior to the installation of such machinery, equipment and facilities.

The rest of section 12 was identical in substance to section 12 of the 1986 lease.

In 1992 Sitka Sound and Yakutat entered into a new lease; its provisions were identical to those of the 1988 lease. Mayor Larry Powell signed the 1992 lease for Yakutat; Harold Thompson, who then owned Sitka Sound, signed for Sitka Sound. None of the disputed items appears to have been installed during the term of this lease; it is therefore not directly applicable.

In 1997 NPPI and Yakutat entered into a new lease; its section 12 differed from the corresponding sections in the prior leases. It stated:

Lessee may, in its sole discretion, make alterations, additions or improvements to the leased premises at Lessee's expense . . . .

All property belonging to Lessee placed upon the leased premises, whether such property consists of furniture, machinery, equipment, appliances, or otherwise, and whether such property is fixed to the real property by means of piping, wiring, bolts or otherwise (hereinafter collectively referred to as "trade fixtures") shall belong solely to Lessee, and, at the expiration or sooner termination of this lease or any renewal or extension thereof, Lessee shall have the right to remove such trade fixtures, provided, however, that after such removal Lessee shall, at its sole expense, restore the leased premises to its condition prior to the installation of such trade fixtures. If at such expiration or termination of this lease or any renewal or extension thereof, Lessee elects to sell its trade fixtures, or any portion thereof, Lessee shall, in such event, give the City a right of first refusal to purchase the trade fixtures or portion thereof which Lessee elects to sell at a price equal to the fair market value of such trade fixtures, f.o.b. Yakutat.

Section 13 of the 1997 lease was identical to the corresponding sections in the prior three leases. The 1997 lease thus gave Yakutat a "right of first refusal" with respect to "trade fixtures," while the previous three leases gave Yakutat an option to purchase "structural improvements and additions." It is undisputed that section 12 of the 1997 lease

applies only to improvements or additions made after it became effective, and that none of the disputed items falls into this category. Therefore, the right of first refusal the 1997 lease gave Yakutat with regard to trade fixtures does not apply to the disputed items. But it is useful to examine the 1997 lease because it sheds light on what the parties meant by "trade fixtures," as opposed to "structural improvements and additions."

As a starting point we recognize that the Restatement (Second) of Property § 12.2(4) states that "[e]xcept to the extent the parties to a lease validly agree otherwise, the tenant is entitled to remove permissible annexations he has made to the leased property . . . if the leased property can be and is restored to its former condition after the removal." [16] In *Interior Energy*, we stated the traditional principle that a tenant may remove trade fixtures if (1) it installed or affixed them to the premises; (2) it did not intend to donate them to the landlord; and (3) the property may be returned to its former condition.[17] With regard to the second factor, we stated that "[i]n the absence of an agreement to the contrary, courts presume that the tenant did not intend to donate the affixed items to the landlord." [18]

The parties agreed that Yakutat had the first option to purchase "structural improve-ments and additions." We therefore must decide what that phrase means and what items it includes. We have found no case discussing an identical phrase. Cases discussing related phrases provide some guidance.

A New York court has defined a "structural change" as

> one that affects "a vital and substantial portion of the premises, as would change its characteristic appearance; the fundamental purpose of the erection; or the uses contemplated, or a change of such a nature as would affect the very realty itself, extraordinary in scope and effect, or unusual in expenditure." [19]

Courts have held the following to be "structural" changes or improvements: (1) new electrical outlets and wiring, new pipes, and fire-retardant walls; [20] (2) a block wall; [21] (3) new doors, a canopy extension, and a brick fascia; [22] (4) an altered sewer system; [23] (5) fire-proof walls; [24] (6) fire-proof paneling, elevator doors, and handrails; [25] (7) fire escapes and fire-proof partitions; [26] (8) flooring changes; [27] (9) improved beams, columns, connections, and shear walls; [28] (10) a storage shed, new door openings, and a concrete pad to support storage tanks; [29] (11) a new floor and surface flooring; [30] and (12) central heat and hot water.[31]

**16.** Restatement (Second) of Property § 12.2(4) (1977).

**17.** *Interior Energy*, 771 P.2d at 1355–56.

**18.** *Id.* at 1356.

**19.** *Riverside Research Inst. v. KMGA, Inc.*, 108 A.D.2d 365, 489 N.Y.S.2d 220, 223 (1985) (quoting *Wall Nut Prods., Inc. v. Radar Cent. Corp.*, 20 A.D.2d 125, 244 N.Y.S.2d 827, 829 (1963)).

**20.** *Margold Residence Corp. v. Younger*, 286 A.D. 244, 142 N.Y.S.2d 46, 47–48 (1955).

**21.** *Polk v. Armstrong*, 91 Nev. 557, 540 P.2d 96, 98 (1975).

**22.** *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 482 N.Y.S.2d 465, 466, 472 N.E.2d 315 (1984).

**23.** *Bush Terminal Assocs. v. Federated Dep't Stores, Inc.*, 73 A.D.2d 943, 424 N.Y.S.2d 28, 30 (1980).

**24.** *Buckley v. Liggett*, 218 A.2d 515, 516 (D.C.App.1966).

**25.** *Ingalls v. Roger Smith Hotels Corp.*, 143 Conn. 1, 118 A.2d 463, 465 n. 1, 466–67 (1955).

**26.** *Sullivan v. New York United Realty Co.*, 250 A.D. 286, 293 N.Y.S. 957, 960 (1937).

**27.** *Hill v. Employers' Liab. Assurance Corp.*, 122 Conn. 193, 188 A. 277, 279 (1936).

**28.** *Palo Alto Town & Country Vill., Inc. v. Deutsche Lufthansa AG*, 2002 WL 1363868, *2 (N.D.Cal. June 17, 2002).

**29.** *Kaydon Acquisition Corp. V v. America Cent. Indus., Inc.*, 179 F.Supp.2d 1022, 1029, 1038–39 (N.D.Iowa 2001).

**30.** *630 McKinley Square Corp. v. Great Atl. & Pac. Tea Co.*, 55 Misc.2d 378, 285 N.Y.S.2d 130, 133 (Civ.1967).

**31.** *Brown v. Denner*, 30 Misc.2d 229, 218 N.Y.S.2d 834, 841 (Mun.1961).

The court in *Shell Oil Co. v. Capparelli* defined "trade fixtures" as property the tenant installed "at his own expense, during the term of the lease, to carry on the business for which the realty was leased."[32] It held that oil storage tanks installed in the ground and covered with concrete were trade fixtures.[33]

In *Consiglio v. Carey* a Massachusetts court had to determine who owned a walk-in freezer, a compressor that supplied the cold air to the freezer, two air conditioners, a dishwasher, and a bar.[34] Consiglio, the tenant, had purchased the dishwasher from a prior tenant, who had installed it, and Consiglio had installed the other items.[35] These were all large items, and some required that the building be modified before they could be installed.[36] The court stated that the right to remove an item depended on the effect on the property of installing and removing the item; an item could be removed if its removal (1) caused no material injury to the estate and (2) would not make the item lose its character or value as personal chattel.[37] The court held that the tenant could remove all of the "trade fixtures," which included all of the items except the dishwasher, because the fixtures satisfied the two conditions above; it remanded as to the dishwasher.[38]

These cases distinguish between structural improvements and trade fixtures based on the item's relationship to the realty. Structural improvements are more closely connected to the building itself than are trade fixtures; structural improvements have little use when not incorporated into a building. Trade fixtures, on the other hand, while sheltered by a building, do have theoretical use outside it. While many, if not all, of the structural improvements listed in these decisions would be considered "trade fixtures" as *Shell Oil* defined that term, structural improvements bear a closer tie to the building than do fixtures.

Yakutat's 1986, 1988, and 1992 leases distinguish between "structural improvements and additions" and "machinery, equipment, and facilities"; the 1997 lease refers to the latter as "trade fixtures." The items in dispute here do not fall squarely within the "structural change" definition set out above, because they did not change the structure's characteristic appearance or fundamental purpose. The structure remains a large building designed to house machinery, and it continues to be available for any purpose for which it could have been used before Sitka Sound installed the items. The disputed items do fall within the definition of "trade fixtures" stated above.[39] Sitka Sound installed them at its own expense, during the term of the leases, to carry on its fish processing business. Nevertheless, the fact these items are "trade fixtures" is not determinative, because many items deemed in the cited cases to be structural changes fall under the definition of "trade fixtures," and are not "structural changes." Therefore, in addition to this definitional factor, we also consider the similarity between the disputed items and the examples from the cited cases.

The items in dispute here fall closer to the cited examples of trade fixtures than to the examples of structural improvements. Yakutat's argument that NPPI's interpretation of "structural improvements" would render the option language superfluous is appealing, but not entirely convincing. One could imagine the tenant removing the kinds of items listed in the structural improvement cases cited above, for example, handrails, fire-escapes, doors, or even electrical wiring. These items would be virtually useless without a building in which to put them, but the tenant could nevertheless remove them and install them in a new building. Thus, NPPI could also have

32. *Shell Oil Co. v. Capparelli*, 648 F.Supp. 1052, 1055 (S.D.N.Y.1986); *see also Interior Energy,* 771 P.2d at 1355.

33. *Shell Oil Co.,* 648 F.Supp. at 1055–56.

34. *Consiglio v. Carey,* 12 Mass.App.Ct. 135, 421 N.E.2d 1257, 1258 (1981).

35. *Id.* at 1259.

36. *Id.*

37. *Id.*

38. *Id.* at 1258, 1260.

39. *See supra* note 32 and accompanying text.

attempted to remove items that are indisputably structural improvements or additions and install them in another fish processing plant. That is what it argues it has the right to do, and what it threatened to do before litigation commenced. Therefore, we cannot say that the option language is rendered superfluous.

The leases' language, as illuminated by case law, consequently tends to support NPPI's argument that the disputed items are not structural improvements or additions, and are therefore not subject to the option to purchase.

### b. Extrinsic evidence supports Yakutat's position.

We next turn to extrinsic evidence to determine whether "structural improvements and additions" is ambiguous. The extrinsic evidence on which the superior court relied to ascertain the parties' intentions largely consisted of the trial testimony of Powell, Yakutat's mayor, and the deposition testimony of Thompson, Sitka Sound's former owner.

Powell testified that it was Yakutat's intention under the option to purchase section to have the right to purchase and maintain "major integral" parts, including the refrigeration and electrical systems. He testified that he and Thompson agreed that individual components of an overall plant system, including compressors, were subject to Yakutat's option to purchase and would not be removed at the end of the lease.

Thompson testified that Sitka Sound did not intend to remove essential components. He also stated that Sitka Sound was entitled under this provision to remove only freestanding, portable items that were not integral parts of the overall system. He testified that Sitka Sound intended refrigeration improvements and components, including compressors, condensers, receivers and the like, to be subject to Yakutat's option to purchase, along with other items integral to the overall plant system.

NPPI argues that Thompson's testimony, given fifteen years after he wrote the letters about the equipment Sitka Sound installed, should not be seen as interpreting the lease; rather, it asserts, he merely assumed that Sitka Sound would not want to remove the equipment if the lease terminated. It argues that his description of the lease provisions concerning the removal of machinery also shows his misunderstanding of the lease. NPPI asserts that he testified that the clause was limited to freestanding items, but that the lease language contradicts his testimony. NPPI similarly argues that Powell testified that equipment could not be removed if it is an integral part of the system, but it points out that the lease does not differentiate between items that are integral and those that are not. NPPI argues that Thompson did not originally negotiate the clause concerning structural improvements, because that clause is from a lease predating Sitka Sound's tenure as lessee.

NPPI's arguments regarding Thompson's testimony are not implausible. But the superior court also relied on Powell's testimony, stating that it "specifically [found] the hearing testimony of Larry Powell regarding the intent of the parties as to the lease language to be credible." "The trial court's findings regarding the credibility of witnesses and weighing of the evidence may be reversed only if clearly erroneous"[40] Having reviewed Powell's testimony, we cannot say that the superior court clearly erred in assessing his credibility. Moreover, Thompson's testimony corroborated Powell's position. The testimony of both witnesses supported Yakutat's position. We therefore conclude that this extrinsic evidence supports the superior court's conclusion that the disputed items are structural improvements or additions.

Based on the leases' language and the extrinsic evidence, we conclude that the parties' conflicting interpretations of "structural improvements and additions" are both reasonable;[41] ambiguity therefore exists.

40. *Rausch v. Devine*, 80 P.3d 733, 737 (Alaska 2003).

41. *See Wessells v. State, Dep't of Highways*, 562 P.2d 1042, 1048 (Alaska 1977).

## 2. Extrinsic evidence resolves the ambiguity.

■ The second stage of the analysis requires courts to examine the extrinsic evidence to help determine the parties' intent and reasonable expectations. The parties' conduct after entering into the contract is probative of intent.[42] Conduct is a better indicator of intent than is testimony.[43]

The following extrinsic evidence helps resolve the ambiguity of "structural improvements and additions": (1) the correspondence between Sitka Sound and Yakutat discussing the expected useful lives of items, (2) the potential economic consequences if the disputed items are removed, and (3) the parties' investment in the plant.

NPPI argues that from 1978 to 2002 the parties to the various leases invoked the option to purchase only twice: (1) in a 1987 letter regarding refrigeration work, and (2) in a letter Yakutat received in January 1988 discussing the electrical upgrade at the little dock. It claims that these were the only two instances in which the parties sought a "mutual agreement of the expected useful life" of a structural improvement; this means that there could not have been any other structural improvements to which the parties believed the option to purchase applied, or the parties would have agreed on their useful lives as well. It also argues that the letters discussing the useful lives are ambiguous. With regard to the first instance, it argues that the twenty-year "life expectancy may refer to the refrigeration work done to install the equipment, not to the equipment itself." With regard to the second instance, the project the letter referred to "might be the electrical service upgrade, and not the purchase of the ammonia compressor, which is equipment."

Yakutat points out that in 1987 and 1988 Sitka Sound and Yakutat upgraded the electrical and refrigeration systems at both the main plant and the little dock, and constructed and installed compressors, condensers, receivers, and blast freezers. It argues that in connection with these projects the parties referred to Yakutat's option to purchase, a contract term of major significance to Yakutat, because it protected Yakutat's investment in the projects.

The two letters describing the proposed projects are ambiguous. They could be referring just to the electrical upgrades that accommodate the new equipment or they could be referring to the equipment itself when they discuss the projects' useful lives of twenty years. The letter about the 1987 refrigeration work from Sitka Sound to Yakutat states:

> the only practical way for us to correct the electrical deficiencies will be to consolidate the present two engine rooms. This will require extensive refrigeration work as well. . . .
>
> . . . .
>
> We also ask permission to perform the refrigeration work necessary for the consolidation of the engine rooms and for the improvements as outlined in the August 4, 1987 letter from Wade & Wyatt Refrigeration Company (attachment G). As mentioned previously, this portion of the project would be at the expense of Sitka Sound and is thought to have a 20 year life expectancy.

This letter also discusses proposed "208 and 440 volt systems." The letter from Sitka Sound to Yakutat about the little dock project states:

> In general terms the project consists of upgrading the electrical service in order to accommodate the addition of an ammonia compressor in order that the ice making and holding equipment is functioning at [its] optimum level. This project would be at the expense of Sitka Sound Seafoods and is thought to have a useful life of 20 years.

Neither letter unambiguously states what items are expected to have a life expectancy of twenty years. Read as a whole, however, they imply that the electrical work, and not the equipment, was expected to have a useful life of twenty years; this is especially true as to the letter regarding the little dock project.

**42.** *State v. Arbuckle,* 941 P.2d 181, 186 n. 5 (Alaska 1997).

**43.** *Sprucewood Inv. Corp. v. Alaska Hous. Fin. Corp.,* 33 P.3d 1156, 1162 (Alaska 2001).

The leases required the parties to discuss useful life before undertaking structural improvements or additions. The parties did not do so except on these two occasions. Similarly, there is no evidence that Sitka Sound asked for permission to make structural improvements, as the leases required, on other occasions. That it did not do so is some evidence that the contracting parties thought that the 1987 refrigeration work and the little dock project were the only structural improvements Sitka Sound made. Yet this evidence is not conclusive.

There was evidence that the cost of removing and shipping the items that Sitka Sound alleged that it owned and restoring the facility to its original condition, as sections twelve and thirteen required, could exceed the revenue from selling the items, resulting in economic waste. Parties to a contract generally intend not to incur economic waste, and in this case this intent is preserved and waste is avoided if the disputed items are not removed or the contract is interpreted as treating the disputed items as structural improvements.

We also consider the amount the parties invested in the facility. NPPI asserts that it and its predecessor invested more than $5 million in the plant. NPPI argues that the superior court impermissibly rewrote the lease to protect Yakutat from the bargain that Yakutat made with NPPI and its predecessor.[44] It contends that Yakutat did not need the superior court's protection, because Yakutat received ample return on its investment in the plant from the royalties and rents it received, and from the plant's importance to the local economy.

Yakutat contends that during the terms of Sitka Sound's and NPPI's leases Yakutat spent $2.1 million on capital projects and major repairs at the facility. It argues that this expenditure is consistent with its view of the parties' mutual intent, because Yakutat would not have spent this money if it had believed it would have received a stripped facility "wholly incapable of performing its core function and purpose—refrigeration." Yakutat contends that the $5 million NPPI claims the lessees invested in the plant includes hundreds of thousands of dollars for which Yakutat reimbursed the lessees, as well as amounts spent on items NPPI legitimately removed from the plant.

Alaska case law does not permit a court "to rewrite a contract for the purpose of accomplishing that which, in the court's opinion, might appear proper"[45] or to " 'create substantive rights under the guise of doing equity,' "[46] except in limited circumstances, none of which is alleged to exist here. Contracts "must be enforced strictly according to their terms."[47]

The extrinsic evidence concerning the total amounts invested does not permit us to rewrite the lease, but it can be probative of intent.[48] We hold that evidence that both parties made substantial investments in the plant supports a conclusion they each intended to retain the items in which they invested.

The extrinsic evidence consequently does not definitively reveal what the parties' intentions were. Yet the parties' conduct and the testimony discussed above reasonably permit an inference that they intended that Yakutat would be able to purchase the disputed items when the lease terminated. Because we apply the clearly erroneous standard when reviewing a trial court's factual findings based on extrinsic evidence,[49] we cannot say that the superior court erred in finding that (1) Powell and Thompson "agree as to the intent of the parties regarding Yakutat's right to purchase such improvements and additions at the facility," (2) "removal would result in economic waste," and

**44.** *See Lathrop Co. v. Lampert*, 583 P.2d 789, 790 (Alaska 1978) (holding that superior court did not possess either equity powers or independent legal authority to condition tenant's relief from forfeiture upon its renegotiating lease rental clause).

**45.** *Id.*

**46.** *Id.* (quoting *Stein v. Simpson*, 37 Cal.2d 79, 230 P.2d 816, 819 (1951) (en banc)).

**47.** *Id.*

**48.** *Arbuckle*, 941 P.2d at 186 n. 5.

**49.** *Fairbanks N. Star Borough v. Tundra Tours, Inc.*, 719 P.2d 1020, 1025 (Alaska 1986).

(3) the "expenditures by Yakutat would not have been necessary if Yakutat was to receive the facility back from Sitka Sound Seafoods in the condition in which it existed in 1986." We therefore uphold the superior court's conclusion that Yakutat had the option to purchase the disputed items.

Our decision should not be read as disapproving the principles expressed in *Interior Energy* and the Restatement (Second) of Property § 12.2(4). We simply hold that the evidence, although disputed, was sufficient to render the findings not clearly erroneous. These findings had the effect of establishing that the parties agreed to terms that rendered inapplicable the common law principles reflected in *Interior Energy* and Restatement § 12.2(4).

## C. NPPI's Current Understanding of Yakutat's Option To Purchase Is Irrelevant.

NPPI argues that the superior court erred in finding that NPPI was "fully aware" that a clause giving Yakutat an option to purchase structural improvements included the option to purchase equipment such as compressors and condensers. NPPI refers us to the testimony of an NPPI vice president who testified about his understanding of "trade fixtures."

 But, as Yakutat contends, the witness was not a participant in the Sitka Sound transactions that preceded NPPI's 1996 purchase of Sitka Sound. We agree with Yakutat that what is relevant is the parties' intentions when they entered into the leases, not the subjective belief of NPPI personnel during litigation years later.[50] A contract is enforceable in accordance with the meaning the parties attach to a contract term at the time they enter into the contract.[51] NPPI's current understanding of the lease is irrelevant.[52]

## D. NPPI's Internal Depreciation Expense Report Should Not Be Used To Set Option Prices.

 NPPI argues that the superior court erred in relying on Exhibit BP to determine option prices for some items. Exhibit BP is an NPPI internal "Depreciation Expense Report" dated December 31, 2001. It lists numerous items; for each item, it lists the acquired value, the depreciation method, the estimated life, and the depreciation. The superior court held that, except for the 1987–88 upgrades at the main processing plant and the 1987–88 electrical upgrade at the little dock, "Yakutat has the right to purchase the ... items ... at their straight line depreciated value, in accordance with the schedule set out in Exhibit BP." The court found that Exhibit BP was the applicable depreciation schedule for these remaining items.

NPPI correctly contends that the trial testimony established that, except for the twenty-year estimates for the 1987 refrigeration project and the little dock project, the parties did not, contrary to the leases, agree on items' expected useful life. NPPI argues that the court should have given effect to the parties' reasonable expectations, and that the parties expected a depreciation schedule that would reflect each item's expected useful life. It asserts that, absent other agreement, the court should have adopted a twenty-year schedule to set the option prices, because that schedule is related to expected useful life, and because most, if not all, of the items subject to the option to purchase will have a useful life exceeding twenty years. NPPI contends that James Kudwa, a senior vice president of NPPI and a certified public accountant, testified that Exhibit BP was not designed to set a price at which NPPI would sell a particular asset and that he was unaware of any company that uses an internal depreciation report in that way. It argues that according to Thompson's testimony, a twenty-year schedule applies, absent agree-

**50.** *See Sprucewood,* 33 P.3d at 1162 (stating that to determine parties' intentions, court considers their intentions at time they sign contract); *Peterson v. Wirum,* 625 P.2d 866, 870 (Alaska 1981) (holding that opinions expressed during litigation regarding parties' intent "do not establish an issue of fact regarding the parties' reasonable expectations at the time they entered into the contract").

**51.** *Sprucewood,* 33 P.3d at 1162–63.

**52.** *Peterson,* 625 P.2d at 870.

ment to a different expected life. NPPI argues that no testimony supports the proposition that the schedule's depreciation periods were intended to set the assets' useful lives.

Yakutat argues that Exhibit BP is not a tax schedule, that it "establishes a life term for each asset," and that it contains NPPI's own realistic evidence of these items' useful lives. Yakutat argues that granting a twenty-year life to every item, as NPPI proposes, contradicts the evidence presented. It asserts that Powell testified that the parties did not intend that all items would have a useful life of twenty years, and that he and Thompson agreed that Sitka Sound's depreciation terms would determine Yakutat's option price. Yakutat contends that Thompson's testimony does not indicate that all items subject to an option to purchase would be subject to a twenty-year useful life. It also argues that no trial evidence supported NPPI's contention that most, if not all, of the items would have useful lives exceeding twenty years; it contends that Powell's testimony instead contradicts NPPI's contention.

Per the leases, the parties were to agree about the useful life of a structural improvement before it was made. With the two exceptions discussed in Part III.B.2, the parties did not agree on any improvement's useful life.

We are unpersuaded by NPPI's argument that the court was required to apply a twenty-year useful life to these items. The leases state that the expected useful life "shall under no circumstances exceed twenty (20) years," not that it shall be twenty years unless agreed otherwise. The evidence did not compel the trial court to find a twenty-year useful life.

We nonetheless agree with NPPI that it was error to use Exhibit BP to determine option prices for the remaining items. Kudwa testified that the depreciation report was not meant to represent true value or the price at which items could be sold, and Yakutat produced no evidence justifying a finding that this internal company report reflected

true values. (Indeed, Yakutat itself attacked the exhibit's accuracy, demonstrating at trial, for example, that it listed an improvement for which Yakutat had paid $277,000.) Powell testified on cross-examination by NPPI that there was a "general understanding" in his discussions with Thompson "that . . . more or less whatever depreciation schedule they were going to use would be how they would finally consider whether or not it had been fully depreciated out or not at the end of the term." But there was no evidence that Exhibit BP was prepared for a purpose even incidentally related to valuing improvements to set a fair price if Yakutat exercised its option to purchase.

Using the exhibit to establish price had the effect of attributing a value of "zero" to valuable refrigeration equipment based on a five-year internal depreciation schedule unsupported by evidence that the items actually had a useful life of only five years. As NPPI contends, this potentially results in Yakutat receiving for free items allegedly worth as much as $732,419. Absent evidence that Exhibit BP was the sort of schedule about which Powell and Thompson had a "general understanding," or that it accurately reflected the expected useful life for the listed items, it was error to rely on it to set the option prices.

Even viewing the evidence in the light most favorable to the prevailing party,[53] it was clear error to find that Exhibit BP determined the value of the disputed items.[54] We therefore reverse the finding and conclusion that relied on Exhibit BP and remand for further proceedings to determine the value of these items.

### E. The Superior Court Did Not Err in Denying Yakutat Full Attorney's Fees.

 Yakutat argues on cross-appeal that the superior court erred in failing to grant its request for an award of full attorney's fees, $90,490.50. The court awarded Yakutat $81,000, "finding this amount reasonable."

**53.** *See Klosterman v. Hickel Inv. Co.,* 821 P.2d 118, 122 (Alaska 1991).

**54.** *See Dunn v. Dunn,* 952 P.2d 268, 270 (Alaska 1998).

Yakutat relies on this language in the 1988, 1992, and 1997 leases:

> If Lessee or City shall bring any action for any relief against the other, declaratory or otherwise, arising out of this lease, including but not limited to any suit by City for the recovery of possession of the premises, the losing party shall pay the successful party a reasonable sum for attorneys' fees in such suit. . . .

It asks that we interpret such provisions to call for an award of full, reasonable attorney's fees.[55] It argues that the superior court did not find that Yakutat's fees were unreasonable, but instead erroneously averaged the parties' fees. It contends that the court erred because it did not explain why it was ruling that the actual fees were unreasonable. It only compared the two sides' fees, a method this court disapproved of in *Gamble v. Northstore Partnership*.[56]

Because we reverse and remand for valuation of some of the disputed items, we recognize the possibility that a new award may replace or supplement the original award. But because the attorney's fees issue may recur, we address it here.

 We agree with NPPI that a trial court has discretion to determine whether the incurred fees are reasonable in situations such as this.[57] Interpreting an attorney's fees clause in a contract presents a question of law, to which we apply our independent judgment.[58] The provision in the contract controls,[59] and a provision that calls for reasonable attorney's fees means full and reasonable attorney's fees.[60] In determining what is reasonable the court may consider " 'the reasonableness of the total time ex-

pended on the case, the hourly rate charged and any of the other components of a reasonable fee. . . . If the court finds that the full amount requested is unreasonable and awards a lesser sum, it must state its reasons on the record.' "[61] A large discrepancy between the fees incurred by each side may be evidence of unreasonableness, but it is not conclusive.[62] We will uphold the trial court's determination regarding attorney's fees unless the trial court abused its discretion.[63]

Before issuing its order, the superior court stated that it would compare the fees incurred by each side, and it presumably based its award on this comparison. The court might have more clearly explained its reasons for the award. But the method of calculation is sufficiently clear for meaningful appellate review, and the record supports the implicit finding that the full amount sought was unreasonable. The superior court's methodology was not erroneous.

## F. NPPI's Appeal Is Not Foreclosed by the Acceptance of Benefits Doctrine and Is Not Moot.

 Yakutat argues that NPPI's appeal should be dismissed under the acceptance of benefits doctrine because it asserts that NPPI, having accepted Yakutat's check for $174,385.88, is foreclosed from appealing the judgment.

 We have not previously considered the acceptance of benefits doctrine. Under the traditional acceptance of benefits doctrine, a party that voluntarily and with knowledge of the material facts accepted the benefits of a judgment was barred from appealing the judgment.[64] This strict ap-

---

**55.** *See Johnson v. Olympic Liquidating Trust*, 953 P.2d 494, 500 (Alaska 1998) (stating that attorney's fees provision in contract controls amount of award); *Jackson v. Barbero*, 776 P.2d 786, 787–88 (Alaska 1989) (same).

**56.** *Gamble v. Northstore P'ship*, 28 P.3d 286, 289–90 (Alaska 2001).

**57.** *See id.* at 290.

**58.** *See A & G Constr. Co. v. Reid Bros. Logging Co.*, 547 P.2d 1207, 1212–13 (Alaska 1976).

**59.** *Johnson*, 953 P.2d at 500; *see also Jackson*, 776 P.2d at 788.

**60.** *Gamble*, 28 P.3d at 288.

**61.** *Jackson*, 776 P.2d at 788 (quoting *Hunsicker v. Thompson*, 717 P.2d 358, 360 (Alaska 1986)).

**62.** *Gamble*, 28 P.3d at 289.

**63.** *Id.* at 290.

**64.** Benson K. Friedman, *An Intent–Based Approach to the Acceptance of Benefits Doctrine in the Federal Courts*, 92 Mich. L.Rev. 742, 742–43 (1993).

proach, however, is generally no longer applied.[65] For example, in *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.*, the United States Court of Appeals for the Ninth Circuit stated that for the doctrine to apply, there must also be an intent "to finally compromise and settle a disputed claim."[66]

We decline to dismiss NPPI's appeal on the acceptance of benefits theory. NPPI specifically informed Yakutat that it was reserving its right to appeal when the parties were discussing the form of the bill of sale.

Yakutat also argues that NPPI's appeal should be dismissed as moot. Yakutat argues that because it invested large amounts of money and labor in repairing and maintaining the disputed items, we could not grant NPPI effective relief even if NPPI were to prevail.

We refrain from deciding cases if " 'the facts have rendered the legal issues moot.' "[67] But Yakutat fails to establish that a remedy would be impossible were NPPI to prevail. Had we reversed the superior court's opinion with regard to whether Yakutat had an option to purchase the disputed items, we or the superior court could have fashioned a remedy that would have considered Yakutat's expenses in improving the plant.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM as to the decision that Yakutat had the right to purchase the disputed items, but REVERSE to the extent the superior court held that the depreciation schedule and values in Exhibit BP apply to any of the disputed items. We REMAND for valuation of those items.

CARPENETI, Justice, not participating.

**65.** 20 James Wm. Moore et al., Moore's Federal Practice ¶ 303.10[2][f] (3d ed.2003).

**66.** *Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co.*, 414 F.2d 750, 752 (9th Cir. 1969); *see also United States v. Hougham*, 364 U.S. 310, 312, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960) (holding that "where a judgment is appealed on the ground that the damages are inadequate, acceptance of payment of the amount of the unsatisfactory judgment does not, standing alone, amount to an accord and satisfaction of the entire claim"). *But see, e.g., Huguley v. John Wright & Assocs., Inc.*, 644 So.2d 911, 913 (Ala. 1994) ("When an appellant is shown to have accepted the benefits of a judgment or order, the appeal will be dismissed.").

**67.** *Hayes v. Charney*, 693 P.2d 831, 834 (Alaska 1985) (quoting *Doe v. State*, 487 P.2d 47, 53 (Alaska 1971)).